ARTHUR MORGAN FOLEY, PLAINTIFF IN ERROR, *v*. SAMUEL T. HARRISON, DEFENDANT, AND LOUIS LESASSIER, INTERVENOR.

In 1841, Congress passed an act (5 Stat. at Large, 455) declaring that there shall be granted to each State, &c., (Louisiana being one,) five hundred thousand acres of land.

This act did not convey the fee to any lands whatever; but left the land system of the United States in full operation as to regulation of titles, so as to prevent conflicting entries.

Hence, where a plaintiff claimed under a patent from the State of Louisiana, and entries only in the United States office; and the defendant claimed under patents from the United States, the title of the latter is the better in a petitory action.

The defendant has also the superior equity; because his entries were prior in time to those of the plaintiff, and the decision of a board, consisting of the Secretary of the Treasury, the Attorney-General, and the Commissioner of the Land Office, to whom the matter had been referred by an act of Congress, was in favor of the defendant.

THIS case was brought up from the Supreme Court of the State of Louisiana, by a writ of error issued under the 25th section of the judiciary act.

It was a petitory action, commenced by Foley in the Fifth District Court of New Orleans, claiming lots No. 1 and 2 of section No. 3, the west half of section No. 10, and the northwest quarter of section No. 15, in township eleven, range thirteen east, containing in all 855 acres and nine hundredths.

By the act of 4th September, 1841, section 8, (5 Statues at Large, 455,) Congress granted to several of the States, of which Louisiana was one, five hundred thousand acres of land each, for purposes of internal improvement; " the selections in all of said States to be made within their limits respectively, in such a manner as the legislatures thereof shall direct; and located, in parcels conformably to sectional divisions and subdivisions of not less than three hundred and twenty acres in any one location, on any public land except such as is or may be reserved from sale by any law of Congress or proclamation of the President of the United States, which said locations may be made at any time after the lands of the United States, in said States respectively, shall have been surveyed according to existing laws."

In 1844, the Legislature of Louisiana, in pursuance of the power with which it was invested by the above-cited act of Congress of directing the manner in which the selections of land thus granted should be made, passed an act establishing an office for the sale of the unlocated lands granted to the State, with a register, and the State treasurer as the receiver thereof. Session Acts of 1844, p. 61.

By the 7th section of that act, it was made the duty of the register and treasurer " to issue warrants for the lands donated by Congress, and not as yet located, provided they shall not be issued for less than eighty nor more than six hundred and forty acres, which warrants shall be sold in the same manner as the lands located, provided they shall not be sold for less than three dollars per acre; and it shall be the duty of the governor to issue patents for all the lands that have been sold, and for the lands located by warrants, when contemplated to be sold by that act, whenever he shall be satisfied that the same have been properly located."

Under the provisions of the above-recited act of Congress, granting the land, and the above provisions of the State legislature, directing the manner in which the selections should be made, Foley purchased two warrants from the State officers, and, on the 7th January, 1846, located them in the Land Office of the United States, at New Orleans, upon the lands now in controversy.

Foley *v.* Harrison et al.

The defendants claimed title under five patents, issued from the General Land Office on the 1st September, 1847. These patents purported to be issued under an act of Congress of August 3, 1846, and were founded on certain floats, which were claimed under the second section of the preëmption act of 1830, (4 Stat. at Large, 421,) which was revived for two years by the act of 19th June, 1834, (4 Stat. at Large, 678.)

In order to show more clearly the respective titles of the plaintiff and defendants, the reporter has arranged them in chronological order.

| | Plaintiff's Title. | Defendant's Title. |
|---|---|---|
| 1830, 1834. | Acts of Congress. | Acts granting preëmption rights — settlements included within the Houmas claim — floats issued — a large part of the claim having been decided to be public land by Commissioner Graham, in 1829, upon which settlements were made. Barrett and Bell located these floats upon the land now in dispute. |
| 1836. | | Commissioner of the General Land Office directed the Register and Receiver at New Orleans to withhold from sale all the lands within the claimed limits of the Houmas grant. May 17. Sale by Barrett to Bell. |
| 1841. Sept. 4. | Congress passed an act (5 Stat. at Large, 455) declaring that there shall be granted to each State, &c., (Louisiana being one,) 500,000 acres of land. | |
| 1844. March 25. | Louisiana passed an act authorizing the State Register to issue warrants for the above land. | The Houmas claim confirmed in its whole extent by the Secretary of the Treasury. Entries made of locations from floats arising within it ordered to be cancelled. Patents were ordered to be issued for the whole of the Houmas claim. May 3. Sale by Widow Bell to Harrison. |
| 1845. Dec. 24. | The Commissioner of the General Land Office wrote that the cancelled entries left the land public, and it could be entered by the State. Foley accordingly made his location. Harrison filed a caveat in the State Land Office. | |
| 1846. | January 7. Foley made his location at the Register's Office of the United States, upon the lands now in controversy. March 9. Commissioner wrote to the Register and Receiver at New Orleans, suspending entries, either by State selection or otherwise. April 20. Foley took out two patents from the Governor of Louisiana. | |

Foley *v.* Harrison et al.

|  |  |
|---|---|
|  | August 3. Congress passed an act providing for the adjustment of all suspended preemption land claims. The Commissioner of the Land Office, the Attorney-General, and Secretary of the Treasury were to decide. |
| Feb. 5. Foley brought suit against Harrison in the fifth District Court of New Orleans (State court.) |  |
| 1847. | June 28. The Secretary of the Treasury decided that he would approve the locations made under the floating claims, held by the actual settlers and improved by them, in preference to the State locations, made subsequently, and covering these improvements. July 9. The Commissioner, August 2. The Acting Secretary of the Treasury, August 27. The Attorney-General; all sanctioned this decision. Sept. 1. Five patents issued from the United States to Harrison. |
| 1848. January 7. Foley located two warrants upon the property in dispute, and entered them at the Land Office of the United States at New Orleans. |  |

The District Court decided that Foley should recover the lot No. 1, of section 3, township eleven, range 13 east, containing $211\frac{99}{100}$ acres, and that the plea of prescription pleaded by defendant be sustained as to lot No. 2, of section 3, township eleven, range 13 east, and the west half of section 10 of the same township and range.

The Supreme Court of Louisiana reversed this decree, and ordered judgment for the defendant for the land in controversy.

Foley sued out a writ of error under the 25th section of the judiciary act, and brought the case up to this court.

It was argued by *Mr. Lawrence*, for the plaintiff in error, and by *Mr. Benjamin*, for the defendant in error.

*Mr. Lawrence.* The 1st section of the act of 1830 gave to any settler on public land, &c., the right of preëmption to the quarter section settled on. The 2d section provided that where two or more persons were settled on the same quarter section, the first two settlers should each take one half of said quarter section, if by a north and south or east and west line it could be so divided as to include the settlement and improvement of each in a half quarter section; and in such case the said settlers shall be entitled to a preëmption of eighty acres of land else-

where in the same district. This latter privilege was called a "floating right," or "float."

Now, without being so hypercritical as to contend that this section only intended to confer a floating right when the quarter section could be divided in half by a north and south or east and west line, so as to include in separate parts the improvements of each settler, it is very clearly the intention of Congress not to confer the right of preëmption to eighty acres "elsewhere," unless the parties had under the same act the right of a preëmption to the quarter-section settled on. If the latter were not public land, were reserved land, were not the subject of a preëmption right, then no settlement on such land could give a floating privilege elsewhere. And so it has been universally held in the land department. In fact, the 4th section of the act expressly declares, "nor shall the right of preëmption contemplated by this act extend to any land which is reserved from sale by act of Congress or by order of the President, or which may have been appropriated for any purpose whatever." 19 Louis. Rep. 399; 2 Laws Ins. and Op. 632.

Now it is especially to be observed that the settlement, out of which these floats are supposed to arise, was within the claimed limits of the Houmas grant. This is not disputed.

By agreement of parties the report of the Secretary of the Treasury on the Houmas claim is made evidence in this cause.

I do not intend to trouble the court with any argument as to the validity or invalidity of the Houmas claim in its whole extent, or in any part of its extent. It has been a matter of controversy in the Treasury Department from the time of the acquisition of Louisiana to this day. All that is necessary to be known in this cause is, that its limits were claimed to be from the Mississippi to the Amité, and so the claim was filed. See Report of Secretary of Treasury, pp. 96, 97.

The 6th section of the act of 3d March, 1811, which authorizes the sale of the public lands in the territory of Louisiana, has the following proviso: "That, till after the decision of Congress thereon, no tract of land shall be offered for sale the claim to which has been in due time and according to law presented to the Register of the Land Office, and filed in his office for the purpose of being investigated by the commissioners appointed for ascertaining the rights of persons claiming lands in the territory of Orleans." 2 Stat. 665.

If, then, this claim has not been acted on by the decision of Congress, neither a preëmption right to land settled on within it, nor a floating right to a preëmption elsewhere by virtue of any settlement within it, could be acquired.

Several different views have been taken of the Houmas

claim. By some it has been supposed to be a complete grant, needing no confirmation from this government. By others it has been supposed to have been confirmed to its full extent by the decisions of the commissioners under the acts of 2d March, 1805, (2 Statutes, 324,) and 21st April, 1806, (2 Statutes, 391,) and by the confirmation certificates issued by the commissioners. By others it has been held that the commissioners had no power under those acts to issue final certificates, and could only submit the claims presented to them for the decision of Congress. Again, it has been supposed that this claim was confirmed by the act of 12th and 18th April, 1814, (3 Statutes, 121–139.)

Now, it is immaterial to the particular question involved in this case, viz. whether the lands within the Houmas claim were reserved lands, which of these conflicting views is correct, or whether any of them are correct. For if Congress, by these acts, has not made its decision on the Houmas claim, then by the act of 1811 it is still reserved from sale. If it was a complete grant from the Mississippi to the Amite, it was not within the operation of the preëmption act of 1830; it was not public land. If, as Mr. Graham supposed, the validity of the grant was affirmed by the commissioners under the acts of 1805 and 1806, but that the extent of its limits required judicial determination, it was still claimed before the boards of commissioners, and filed with the recorder of land titles, as a grant from the Mississippi to the Amité, and, unless it has been acted on by Congress, is still reserved from sale, under the act of 1811. If the commissioners, under the acts of 1805 and 1806, had power to decide this claim finally, then they did decide in favor of the claim, and issued their certificates of confirmation, and it was no longer public land. If the effect of the act of 1814 was to confirm the certificates issued by the commissioners under the acts of 1805 and 1806, as Mr. Secretary Bibb decided, (and under his decision patents have been issued for the whole Houmas claim,) then the act of 1814 was the decision of Congress contemplated in the act of 1811, and the claim, to its full extent, was private property, and not public land. And if, as Mr. Attorney-General Clifford holds, the act of 1814 was only intended to cover cases in which certificates of confirmation had been properly issued, under the acts of 1805 and 1806, and these certificates had not been properly issued, then the Houmas claim is still undecided, and, of course, the land within it is still reserved.

It is obvious, then, that under any of these conflicting views, the land within the limits of the Houmas claim was not subject to the operation of the preemption laws, and that the settlements thereon conferred no rights either to the lands themselves or to floats. The entries which were permitted, therefore, were,

absolutely void; and so Attorney-General Legare decided. Brown's lessee v. Clements, 3 Howard, 664 – 5; Wilcox v. Jackson, 13 Peters, 498; Stoddard v. Chambers, 2 Howard, 318.

The entries, permitted by the location of these floats, were accordingly cancelled in 1844. And it was after this cancellation of those entries that our locations were made by virtue of the State warrants.

The court below seemed to be of opinion that these entries were authorized by Commissioner Graham, in a letter to the surveyor-general, of February 17, 1829. (2 Laws Ins. and Op. 893.

In this letter Mr. Graham supposes that the board of commissioners had only decided on the validity of the grant, leaving the extent to be determined by the courts. And he supposes that a survey running back $1\frac{1}{2}$ leagues in depth, would leave sufficient space for the determination of the courts. But he does not, by a single word, authorize (if he could) the register and receiver to permit entries of any kind. The letter was not addressed to them. Indeed, the land was not at that date subject to sale, public or private. There was no preëmption law in force at the time. But if there had been, and if it had contained instructions to permit entries beyond the league and a half, it would have been in direct contravention of the act of 1811. These entries were permitted by the register and receiver, not only without any instructions from the General Land Office, but in violation of the act of 1811, and were therefore void.

Now we do not rely upon any particular virtue in the mere act of cancellation, except so far as it was an official declaration of the invalidity of the floats. We do not mean to contend that the General Land Office can take away any real right of a certificate holder, by cancelling the certificate; and yet we do not doubt that the commissioner may cancel a void certificate of entry. The cancellation does not make the entry void, but the nullity of the entry is the reason for the cancellation. The party is not deprived of any right by the cancellation, because, the entry being void, the party had acquired no right by the entry.

But whether these entries were cancelled properly or improperly, or if they had not been cancelled at all, it is enough for our purpose that they were void. They formed no obstacle to the sale of the land to any one else, or to a location of the land by any one else.

This is the uniform and clear doctrine of this court, as well as of the Supreme Court of Louisiana itself. Wilcox v. Jackson, 13 Pet. 498; Ballance v. Forsyth, 13 Howard, 18; Campbell v. Doe, 13 Howard, 245; 19 Louis. Rep. 334, 510; 3 Rob. 293.

We have thus far considered the right of the plaintiff in error, upon his certificates of location alone, and without reference to the State patents.

According to the cases above cited from the Louisiana Reports, such certificates were sufficient ground for a petitory action.

The case of Surgett v. Lapice et al. 8 Howard, 48, in this court, sustains the same ground.

2. Let us now inquire whether those patents, under the act of Congress of 1841, do not pass the fee in the lands selected, without any further patents from the United States.

The court below seem to suppose that nothing but a patent can pass the fee from the United States, and they cite cases to sustain that view. If that court had examined those cases a little more carefully, it would have been seen that this court expressly mentions legislative grants as cases in which no patent issues. Wilcox v. Jackson, 13 Pet. 498.

The act of 1841 enacts that there shall be granted to each of the States named 500,000 acres of land; and provides that the selection should be made in the manner directed by the State legislatures. It does not itself provide for the issuing of patents by the General Land Office. The Legislature of Louisiana directed the manner in which her selections should be made, and also that the governor should issue patents. As soon, then, as the locations of the State warrants were made in the United States Land Office, upon public land which had been surveyed, and which was not reserved, then by force of the act of Congress of 1841, and the act of the State legislature in pursuance of it, the fee in those particular lands passed from the United States.

It has been shown, then, that, at the time when Foley's locations were made on the lands in controversy, they were public lands, and that the defendant's location of floats thereon was void, and had been cancelled by the land office, because the settlements out of which those floats had arisen were within the Houmas claim.

Let us now see by what authority the patents were subsequently issued to the defendant upon these floats.

They were issued under the supposed authority of the act of 3d August, 1846, (9 Stat. 51,) upon the mistaken idea that the State selections required the approval of the Treasury Department before any right could be acquired under them.

It is to be observed that the State selections were not approved by the General Land Office merely because of a contemplated law, (which, as will be seen hereafter, never passed,) to confirm the entries by floats arising out of the Houmas claim. No other reason is assigned for their non-approval. The very

letter which submits them for the action of the secretary, states that the selections were made on land liable to selection, and that the register and receiver had been so instructed. And the Secretary of the Treasury, in making his decision, offers no objection to the propriety of the State selections. He merely "proposes" to approve the locations by the floats, rather than the locations by the State warrants, under the idea that the respective rights of the parties rested in his discretion alone.

Now there is not one word in the act of 1841 requiring the State selections to be approved by the Treasury Department. The selections were to be made in the manner to be directed by the State legislatures. It is true the selections could only be made of surveyed, unreserved public land, and in certain parcels. But that is just as true of all the preëmption laws. And yet this court has uniformly held that a preëmptioner acquires a right by his settlement under the law, although the land department disapproves of the entry. Lytle v. Arkansas, 9 Howard, 314; Cunningham v. Ashley et al. 14 Howard, 377; Surgett v. Lapice, 8 Howard, 48.

There are laws which expressly require the approval of the Secretary of the Treasury, but this is not one of those. The land department has a very proper regulation of its own, both in regard to State selections and claims to preëmption, under which its officers examine whether the particular case conforms to the law under which the claim is made. But it is not understood there as adding any thing to the right of the claimant by its approval, or taking away any thing from it by its disapproval. If the law gives the right, the person has it, whether the office approves or disapproves.

But if any approval were necessary to confirm the plaintiff's right, such approval was had, as to two of the tracts in controversy.

3. It is submitted, on the part of the plaintiff in error, that the act of 3d August, 1846, was not applicable to the case of the defendants in error. That act applied to "suspended" entries, not to void and cancelled entries. The term "suspended entries" is one well known to the land office, and is always used to designate entries of land under the authority of law, but which are not patented, because of some informalities attending them. They are, consequently, held in suspense in the General Land Office, until those informalities are cured. But in the case of void entries they are cancelled, and the receiver is ordered to refund the money paid on them.

It is true that a law was recommended to Congress confirming entries by floats arising out of the Houmas claim. But that recommendation was not carried into effect; and the reason

why it was not carried into effect was, that almost every one of them was found to be fraudulent. But even that law only proposed to confirm entries where no private right had in the mean time been acquired. And it also was intended to exclude all cases in which fraud appeared.

But the law did not pass, and for good reasons; and the attempt is now made to bring these void, cancelled, and probably fraudulent, entries within a general law applicable to all the States, providing merely for the issuing of patents in suspended cases.

4. But even if the defendant's entries were within the meaning of the act of 1846, the rights of the plaintiff are expressly saved. The proviso to the first section enacts that the adjudications "shall only operate to divest the United States of the title to the land embraced by such entries, without prejudice to the rights of conflicting claimants."

Without this proviso there can be little doubt that any previously-acquired right would be good against the confirmation authorized by this act. But with the proviso, such rights cannot be overlooked. Mills v. Stoddard, 8 Howard, 365; Stoddard v. Chambers, 2 Howard, 284; Ballance v. Forsyth, 13 Howard, 18.

5. As to the plea of prescription:

Under the Constitution of the United States, and the acts admitting new States into the Union, no State law can interfere with the primary disposal of the public lands. Prescription cannot run until the legal title is out of the United States. Were it otherwise, effect could be given to State laws which would invalidate the titles emanating from the United States, and deprive the federal government virtually of the power of disposal which the Constitution secures. The legal title did not pass to the plaintiff until the location was made on the lands in controversy in 1846. This suit was commenced in 1847.

By an agreement, found on page 75 of the record, it will be seen that all questions as to improvements, rents, profits, are reserved.

It is confidently submitted:

1. That the floats of the defendant were originally void, because they arose from a settlement on reserved land.

2. That the location of those void floats on the tracts in controversy gave no title whatsoever to those tracts.

3. That those tracts were in 1846 (and were so decided to be by the land department) public, unreserved, surveyed lands, and consequently within the operation of the act of 4th September, 1841.

4. That the locations of the plaintiff were made in the manner directed by the legislature of Louisiana.

5. That those locations, so made, gave to the plaintiff a valid right to the tracts located, by force of the act of 1841, without any approval of the land department.

6. That if such approval had been necessary, it was had in the letter of the commissioner, on page 14 of the record.

7. That no subsequent law of Congress could defeat such right.

8. That the act of 3d August, 1846, expressly reserved such right, and that for these reasons the plaintiff in error is entitled to recover.

Mr. *Benjamin,* for the defendant in error, made the following points.

I. The title set up by plaintiff is not, under the evidence adduced, either a legal or equitable title to the land in controversy.

The 8th section of the act of Congress of the 4th September, 1841, (5 Statutes at Large, 455,) granting 500,000 acres of land to the State of Louisiana, does not set apart any particular land, and separate it from the public domain. It only authorizes the State to make locations of land to that extent; and the location, when made by the State, does not *ipso facto* separate from the public domain the land so located. Nothing in the act deprives the officers who are charged with the duty of executing the land laws of their control over the locations, in order to see that they conform to the law; that they are lands which have been previously surveyed; that they are vacant; that they have not been reserved, &c., &c. It is only upon the approval of such locations that the final severance from the public domain of the lands so located takes effect.

Such is the practice and settled construction of the law in the General Land Office.

The location by the State, of the land in controversy, was not approved.

The patents issued by the State of Louisiana can have no effect upon the title; they only operate as a conveyance of the right of the State. Now, these patents are dated 20th April, 1846. But on the 9th March, 1846, the commissioner of the General Land Office had instructed the land officers in New Orleans not to permit the location of the lands in controversy, and had reserved action on locations already made, until Congress should determine the course to be pursued.

It also appears, from the testimony of Robert J. Ker, the Register of the State Land Office, that the plaintiff was aware that the land which he sought to locate under the State warrant, was claimed by others; that the warrant for the entry of the land in controversy was refused to him, and only floating warrants ac-

corded; and that under these floating warrants he entered the very lands which the State register had refused to him.

The foregoing recital of facts shows a total absence of any title whatever. The United States have issued a patent certificate to defendant, and having refused to issue a patent to the plaintiff, or to approve of his location, the case comes completely within the principles established in Wilcox v. Jackson, 13 Peters, 498; Bragnelle v. Broderick, 13 Peters, 436.

II. The question of title between the parties has already been settled by the judgment of a special tribunal, authorized by Congress to take cognizance of the controversy, and to decide it conclusively between the parties.

By the first section of the act of Congress of 3d August, 1846, (9 Statutes at Large, 51,) the Commissioner of the General Land Office was " authorized and empowered to determine, upon principles of equity and justice, as recognized in courts of equity and in accordance with general equitable rules and regulations, to be settled by the Secretary of the Treasury, the Attorney-General, and Commissioner, conjointly, consistently with such principles, all cases of suspended entries now existing in said land office, and to adjudge in what cases patents shall issue upon the same." The second section of the laws speaks of " the power and jurisdiction " given to the commissioner, and of his " adjudications; " and the fourth section directs patents to issue to those persons in whose favor decisions have been rendered.

By reference to the record, page 57, it will be seen that the tribunal, thus authorized by Congress, made an adjudication in favor of the defendant in error, which was approved by the acting Secretary of the Treasury, p. 59, and by the Attorney-General, p. 59, and was in conformity with the rules and regulations established under the act, and the principle previously proposed by the secretary.

The act of Congress grants no appeal from the decision of the commissioner, and the proposition is too clear for argument that the power of Congress to dispose of the public lands is complete and unlimited. If, therefore, the case was within the jurisdiction conferred by the act, the question is *res judicata.*

The act confers the power to decide " all cases of suspended entries now existing in said land office." Was the case of defendant a suspended entry? A conclusive answer to this inquiry is found in the letter of the Commissioner of the General Land Office, dated 9th of March, 1846, in which he expressly says that these entries, as well as the State selections, are " suspended to await the action of Congress."

But it is contended that the original entries, under which the patents were issued to defendants, were utterly void, as being in

. violation of the proviso of the 6th and 10th sections of the act of Congress of 3d March, 1811, (2 Stat. at Large, 662.) The answer to this objection is found in the fact that the confirmation of the Houmas grant by the act of the 12th April, 1814, (3 Stat. at Large, 121,) satisfied the object of this proviso.

But, independently of this consideration, it is sufficient to say that the question whether the entries were or were not void, is one of the very questions which, by the terms of the act of Congress, were submitted to the decision of the special tribunal created by that act. Its language declares that the commissioner is to decide " all cases of suspended entries," and necessarily confers on him the power to decide whether the entry was void or voidable, or valid. This is the precise jurisdiction conferred on him, and the jurisdiction is without appeal. The argument of the plaintiff calls on this court to reverse the decision of the commissioner who pronounced that the entry was not void, but was a sufficient basis for a patent, which is equivalent to calling on the court to exercise an appellate jurisdiction over his judgment on the merits of the entry. The commissioner can in no sense be said to have assumed a jurisdiction over a subject not confided to him by the act. There is no exception made by the lawgiver — all suspended entries are to be determined. The only legitimate subject of inquiry is, whether the defendant's entry was a suspended one ; as soon as this is ascertained in the affirmative, the jurisdiction attaches, and the allegation by the plaintiff that the entry was void is simply an assertion that the commissioner erred in deciding it not to be void.

That the decision of the tribunal, created by the act of Congress to decide on this suspended entry, is conclusive, is established by the jurisprudence of this court. Wilcox v. Jackson, 13 Peters, 498 ; Elliott et al. v. Peirsol et al. 1 Peters, 328.

Mr. Justice McLEAN delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Louisiana.

A petitory action by petition was commenced in the fifth District Court of New Orleans, on the 5th of February, 1847, by the plaintiff in error, claiming a tract of land of which the defendant had possession. The plaintiff claims under two patents from the State of Louisiana, issued under the law of that State of the 25th of March, 1844, and alleges title in the State, under the act of Congress of 4th September, 1841.

On the day the action was commenced, the defendant filed his answer claiming the same land under a purchase made by Robert Bell and Thomas Barrett from the United States, the 16th of May, 1836, and by mesne conveyances transmitted to

the defendant.   He pleads a prescription of a peaceable posses-
sion of more than ten years — that large and valuable improve-
ments have been made on the premises, &c.

On the trial in the District Court of New Orleans, the plain-
tiff gave in evidence, patents from the State of Louisiana, for
eight hundred and fifty-five acres and nine hundredths of an acre,
the land in controversy, by virtue of the act of Congress of the
4th of September, 1841.   The certificates of entries of the land
were also in evidence.

The defendant produced in evidence five patents from the
United States, dated 1st of September, 1847, and a sale of the
premises by Thomas Barrett to Robert Bell by authentic act on
17th May, 1836, and a series of mesne conveyances, terminating
in a sale and conveyance by the widow R. Bell, to the defend-
ant, on the 9th of May, 1844.

A jury not being demanded under the Louisiana law, the
court gave judgment that the plaintiff recover of the defendant
lot No. 1 of section 3, township 11, range 13 east, containing
211 acres.   The plea of prescription was sustained as to the
residue of the tract.   From this judgment the defendant ap-
pealed to the Supreme Court of the State.

The Supreme Court reversed the judgment of the District
Court, and entered judgment in favor of the defendant for the
land in controversy.

The plaintiff, on the ground that he claimed title under an
act of Congress, and relied on the construction of another act,
to nullify the title of defendant, and as the decision of the Su-
preme Court was against the right asserted by him, procured
the allowance of a writ of error under the 25th section of the
judiciary act.

The 8th section of the act of 4th September, 1841, declares,
" that there shall be granted to each State specified in the first
section of the act, of which Louisiana is one, five hundred
thousand acres of land for purposes of internal improvement,"
provided such State had not received land for that purpose.
And it is provided that " the selections in all of the said States,
shall be made within their limits respectively, in such manner
as the legislature shall direct; located in parcels conformably to
sectional divisions and subdivisions, of not less than three hun-
dred and twenty acres in any one location, on any public land
except such as is or may be reserved from sale, &c.;" no loca-
tions to be made until the land shall be surveyed by the United
States.

In 1844 the legislature of Louisiana passed an act, establish-
ing an office for the sale of the unlocated lands granted to the
State, with a Register and State Treasurer as receiver.

The 7th section of the act makes it the duty of the register

Foley *v.* Harrison et al.

and treasurer, to issue warrants for the lands donated by Congress and not as yet located, provided they shall not be issued for less than eighty nor more than six hundred and forty acres, which warrants shall be sold in the same manner as the lands located, provided they shall not be sold for less than three dollars per acre; and it shall be the duty of the governor to issue patents for all the lands that have been sold, and for the lands located by warrants, when contemplated to be sold by that act, whenever he shall be satisfied that the same must have been properly located."

Under the act of Congress and the State law, the plaintiff purchased, it is alleged, two warrants from the State officers, and on the 7th of January, 1848, entered them in the Land Office of the United States, at New Orleans, upon the lands in controversy. And it is contended, that these locations, independently of the patent issued by the State, being made on public land not reserved from sale by any law of Congress or proclamation of the President, which had been surveyed, and were entered in parcels conformably to the act of Congress, gave the plaintiff a right to the lands in controversy under the act of 1841, unless the defendant had, at that time, an equitable or legal title to them.

The act of 1841 authorized the State to enter the lands, where surveys had been executed and the lands were open to entry, under the acts of Congress. The State of Louisiana acted within its powers, in issuing warrants, and establishing land offices, as a means of disposing of the lands. But it had not the power to convey the fee, as it had not been parted with by the general government. The words of the act of 1841, are " that there shall be granted to each State," not that there is hereby granted. The words import, that a grant shall be made in future. Lessieur et al. *v.* Price, 12 Peters, 75.

It could not have been the intention of the government, to relinquish the exercise of power over the public lands, that might be located by the State. The same system was to be observed in the entry of lands by the State as by individuals, except the payment of the money; and this was necessary to give effect to the act, and to prevent conflicting entries.

The defendant claims under five patents from the United States, dated the 1st of September, 1847, which was some months after this suit was commenced. These patents were issued under the act of 3d of August, 1846. That act provides, " that the Commissioner of the General Land Office be, and he is hereby authorized and empowered, to determine, upon principles of equity and justice, as recognized in courts of equity, and in accordance with general equitable rules and regulations, to

be settled by the Secretary of the Treasury, the Attorney-General, and Commissioner conjointly, consistently with such principles, all cases of suspended entries, now existing in said land offices, and to adjudge in what cases patents shall issue upon the same." This power is limited to two years; and the exercise of it shall only operate to divest the title of the United States, but shall not prejudice conflicting claimants.

By the above act the commissioner was required to arrange his decisions in two classes, and the 4th section requires patents to be issued in cases in the first class.

On the 9th of July 1847, the commissioner reported to the Secretary of the Treasury "ten entries by preëmption, made at the Land Office of New Orleans, which were heretofore suspended, at the General Land Office. He says, they have been adjudicated by me and placed in the first class, under the act of the 3d August, 1846. It is stated that the first seven, of the ten cases reported, are entries by floats, arising from settlements within the Houmas claim, and would have been embraced with similar cases in abstract No. 13; but that the land in whole or in part, has been selected by the State under the act of 4th of September, 1841, since the floats were decided to be illegal under the act of 1834." This report is agreed to by the acting Secretary of the Treasury and the Attorney-General.

As this decision was made by a special tribunal, with full powers to examine and decide; and, as there is no provision for an appeal to any other jurisdiction, the decision is final within the law.

Under the preëmption act of 1830, revived and continued for two years by the act of 1834, preëmption rights were granted to settlers on the public lands, not exceeding to each settler one hundred and sixty acres. And where two settlers are found on the same quarter section, each being entitled to a preëmption for one hundred and sixty acres, the quarter which they occupied was divided between them, and each received a certificate for eighty acres in addition, giving a preëmption right elsewhere on the public lands, which certificates were called floats. A number of these certificates were purchased by Thomas Barrett and Robert Bell, and by virtue of which they located the land in dispute. The settlements on which these certificates were issued were made on the Houmas claim, and as doubts existed whether the land embraced by this claim would be properly called public lands, under the preëmption laws, the entries were suspended. And these were the entries included in the above report of the Commissioner of the General Land Office, and sanctioned by the Secretary of the Treasury and the Attorney-General.

The patents issued by the State to the plaintiff were dated the 20th of April, 1846. And it seems that, on the 9th of the preceding month, the Commissioner of the General Land Office wrote to the Register and Recorder of New Orleans: "As Congress has taken the subject of the floating preëmption entries arising from preëmption settlements within the limits of the Houmas private claim into consideration, and is about to confirm them in the hands of *bonâ fide* assignees, I deem it proper, in order to prevent future inconvenience, to direct that all the land embraced by such entries, except as to those where the purchase-money has been refunded and the claim abandoned, be hereby considered as excused from disposition in any way, either by State selection or otherwise. The State selections already made will be suspended to await the action of Congress."

" If the contemplated law confirms all entries in the hands of *bonâ fide* assignees, it will, in all probability, defeat all locations made by State selections. In the mean time, it is necessary that all appropriations of the lands covered by such entries be suspended."

It is true that, on the 24th December, 1845, the commissioner wrote to the same land office " that, after the cancellation of preëmption claims, if the land is not otherwise interfered with or reserved, it is considered as public land liable to be located by the State." And it seems that the tracts for which the plaintiff obtained patents, were designated in the letter of the commissioner as coming within the category.

This decision or opinion of the commissioner did not affect the rights of the defendant, as appears from subsequent proceedings of the same office. As soon as the defendant was apprised of the above letter, he filed a caveat in the State Land Office, and, on the 9th of March, 1846, the commissioner, in his letter, as above stated, suspended the plaintiff's entries. And, on the 25th of June, 1847, the Secretary of the Treasury, on a representation made by the Commissioner of the Land Office, " approved the locations made under the floating claims, held by the actual settlers who had improved the land, in preference to State locations. And this decision was sustained in the proceeding under the act of the 3d of August, 1846, by the report of the commissioner, sanctioned by the Secretary of the Treasury and the Attorney-General, as above stated.

The Houmas claim, as filed before the Commissioners on Land Titles, extended from the Mississippi river to the Amite, embracing a large extent of country. It was confirmed by the commissioners, and also by an act of Congress passed in 1814. This confirmation, however, was construed to be limited, and

38 *

not extending to the boundaries claimed. The survey authorized by the Treasury Department extended only one and a half leagues back from the river; and the register and receiver were instructed to treat the residue of the claim as public lands. This induced a great many persons to settle on the claim up to the year 1836. In that year, by order of the Land Office, the register and receiver were directed to withhold from sale the lands within the claim. This suspension was continued, and the patent certificates which had been issued to purchasers were declared to have been issued without authority.

Afterwards, in 1844, this claim, to its whole extent, was recognized as valid by the Secretary of the Treasury; in consequence of which, entries made within the grant were cancelled, and the purchase-money returned. This action of the Land Office has been referred to, for the purpose of understanding the nature of the preëmption rights acquired by settlers upon the Houmas claim, and the floats which were issued, as above explained, under the law. These floats were issued under the authority of the government, and, when presented by *bonâ fide* purchasers, could not be disregarded. This was the origin of the right set up by the defendant. It has been sanctioned by the Land Office, by the Secretary of the Treasury, and the Attorney-General, under the act of 1846, and a patent has been granted. Under the claim of the defendant, possession of the land has been held many years, and the improvements on it have made it of great value.

The plaintiff's title originated by his obtaining a float, as it was called, from the State Land Office, at three dollars an acre, in virtue of which he located the land in controversy, on 7th January, 1846, with the Register of the Land Office of the United States. The plaintiff, through John Laidlaw, made an application to have the land specified in the float or warrant, but the Register of the State declined to specify any lands in the warrant. He refused for some time to issue a patent on the location, as he had "misgivings" as to whether it would be right for him to do so; but eventually he issued it on the order of the governor, to test the validity of the title.

As the patent from the State did not convey the legal title to the plaintiff, he must rely only on his entry, and that, in a petitory action, cannot stand against the patent of the defendant. But, if the case were before us on the equities of the parties, the result would be the same. The entries of the land claimed by the defendant were prior in time to those of the plaintiff, and of paramount equity. The entries of both claims were suspended by the order of the government, and the decision of the Secretary, and especially the decision of the Com-

·missioner, the Secretary of the Treasury, and the Attorney- General, under the act of 1846, was final, and related back to the original entries of the land. The circumstances under which the plaintiff located his warrants on a very valuable sugar plantation, of which the defendant had long been in possession, do not strongly recommend his equity. We affirm the judgment of the Supreme Court of Louisiana, with costs.

## Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Louisiana, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged, by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.