[No. 2,599.]

## SAMUEL J. SHERMAN *v.* D. S. K. BUICK.

TITLE OF STATE IN SIXTEENTH AND THIRTY-SIXTH SECTIONS.—The Act of Congress of March 3d, 1853, granting to the State of California the sixteenth and thirty-sixth sections of the public lands within said State, vested absolutely in the State the title to those sections, upon their being surveyed; and Congress had no power after the passage of said Act to impair the grant, or prevent the title to those sections from vesting in the State, upon their being surveyed.

PRE-EMPTION ON SIXTEENTH AND THIRTY-SIXTH SECTIONS.—The Act of Congress of May 30th, 1862, authorizing settlements to be made on unsurveyed lands, did not have the effect of extending the right of preëmption to the sixteenth and thirty-sixth sections in the State of California.

APPEAL from the District Court of the Third Judicial District, County of Santa Clara.

The exterior lines of the township in which the demanded premises are located were surveyed by the United States in 1852.

The defendant recovered judgment, and the plaintiff appealed from the judgment and from an order denying a new trial.

The other facts are stated in the opinion.

*Moore & Laine,* for Appellant.

The plaintiff produced a patent for the *locus in quo,* from the United States, the paramount source of title, and it should prevail over a patent from the State of California (a subordinate source of title), until impeached. No attempt

was made to impeach it, or to show prior equities in the holder of the State patent. This being so, the holder of the United States patent should prevail without regard to the dates of the patents. (*Megerle* v. *Ashe*, 27 Cal. 328, 329; Washburn on Real Property, Vol. 3, p. 175; 18 Howard, U. S. 88; *Middleton* v. *Low*, 30 Cal. 596.)

There must be a showing of title in the State, before one claiming under her patent can prevail against a holder of the United States patent; the fact that the land sued for is a part of a thirty-sixth section, is not sufficient, because these sections were not granted absolutely, but only on the condition that they should be free from preëmption settlements when surveyed. (See Act of Congress, March 3d, 1853, making the grant; Lester's Land Laws, etc., p. 207, Secs. 6, 7; *Middleton* v. *Low*, 30 Cal. 603; 18 Howard, U. S. 179; Instructions of the General Land Office, Lester, p. 695; see also, Lester, p. 306, No. 353.)

Under these grants no title vests in the State until the lands are certified over by the United States. (Lester, p. 236, No. 249, Act of Congress of May 3d, 1854.)

The statutes of California have all been framed on this idea, that the sixteenth and thirty-sixth sections were open to preëmption if settled upon before survey. (See Acts of 1861, Stats. 1861, p. 218, Sec. 1; 1863, Stats. 1863, p. 593, Sec. 5; 1868, Stats. 1867–8, p. 510, Sec. 13; 1870, Stats. 1869–70, p. 875, Sec. 12.)

It will be contended that the State patent is conclusive evidence (until properly impeached); that all the acts and steps of the State officers, prior to the issuance of the same, have been properly taken, that were required by law to be taken. This we submit is equally so as to the United States officers, and under the State laws her officers could issue a patent without waiting for the land to be certified over to

the State, and without making inquiry as to whether a preëmptor had rights there; but the Federal officers could not have done their duty and have issued a patent to a preëmptor if the land had been already certified over to the State.

*S. M. Wilson* and *George A. Nourse,* also for Appellant.

The State is admitted to have had no title to this land, unless, by operation of the school land grant of sections sixteen and thirty-six in each township, made parenthetically in section six of the Act of Congress of May 3d, 1853.   (1 Lester, 205; 10 Stats. at Large, 244.)

Section seven of the same Act excepts from this grant all sections sixteen and thirty-six upon which settlement may be made, before survey, by the erection of a dwelling house or the cultivation of land.

This does not apply to preëmption settlements alone, made under the provisions of the same Act.   It applies to all settlements made on such section before survey—whether under the agricultural preëmption Acts then in force, or those that might be subsequently passed, or by occupants of town sites on mineral land, under section eight of the same Act.   The language of the exception could not be more sweeping.

No title to any land could vest in the State under the school land grant until survey thereof.   The grant is of "sections sixteen and thirty-six in each township."   Until survey there is and can be no section sixteen, no section thirty-six.

The survey does not merely designate the land already granted; it creates the section sixteen or thirty-six; and thereby, for the first time, a subject matter of the grant comes into existence.   (*Grogan* v. *Wright,* 27 Cal. 521; *Robinson* v. *Forrest,* 29 Cal. 325.)

"The lines are not ascertained by the survey, but they are

created." (*Middleton* v. *Low*, 30 Cal. 604, 605; *Cooper* v. *Roberts*, 18 How. 179, 180; *Gaines* v. *Nicholson*, 9 How. 356.)

Until a subject matter of the grant thus comes into existence, the grant must be inoperative. (5 Black. Com. 296.)

"So as in every grant there must be a grantor, a grantee, and a thing granted." (See opinion of Attorney General Cushing on the Iowa Railroad grant, 8 Opp. Atty. Gen. 244.)

In analogy with this principle, the decided cases hold unanimously that no title to any specific land vests in the State under the five hundred thousand acre grant until survey and selection thereafter. (*Foley* v. *Harrison*, 15 How. 447; *Doll* v. *Meader*, 16 Cal.)

In this last case (as in *Van Valkenburgh* v. *McCloud*, 21 Cal. 330), the Court held that the State might select lands under the five hundred thousand acre grant before survey by the United States; but in *Terry* v. *Megerle*, and in subsequent cases, that doctrine is expressly repudiated by this Court. (*Terry* v. *Megerle*, 24 Cal. 624; *Megerle* v. *Ashe*, 27 Cal. 328; *Bludworth* v. *Lake*, 33 Cal. 261, 262.)

Yet the words "shall be and hereby is granted," etc., are in the Act of September 4th, 1841 (5 Stats. at Large, 455), under which California obtained the five hundred thousand acres referred to.

Nor do the decisions under the swamp land grant Act conflict with this principle. There is a distinction between the swamp land grant and that of sections sixteen and thirty-six. In the one the subject matter was as truly swamp land before survey as after. In this case the subject matter (Secs. 16 and 36) does not exist until survey. All the swamp land decisions are based upon this distinction, and only hold that title to the swamp lands passed from the United States to the State by the grant, without the necessity of their being subsequently listed over or patented. (1 Lester, Swamp Land Grant, 182; *Summers* v. *Dickinson*, 9 Cal. 554; *Owens* v. *Jackson*, id. 322; *Kernan* v. *Griffith*, 27 id. 87; *Robinson* v.

*Forrest*, 29 id. 317; *Railroad* v. *Fremont Co.*, 9 Wallace, 89; *Railroad* v. *Smith*, id. 95.)

In this last case the dissenting opinion by CLIFFORD, J., seems to have more reason than the opinion of the majority of the Court. But neither hurts us.

Nor does any decided case, not now overruled, hold any doctrine repugnant to our position. We will glance at those which in a case thoroughly argued of late before the Secretary of the Interior,' were cited as conflicting with our views. It will be seen that in none of them does the point decided sustain the decision originally made in the case at bar.

*Higgins* v. *Houghton*, 25 Cal. 252, only decides: First, that mineral lands are not excepted from the school land grant; second, that no patent, list, or certificate is necessary to vest in the State the title to sections sixteen and thirty-six. All that is said beyond this, in the opinion of the Court, is mere *obiter dictum*, and very incorrect in some matters of fact as well as of law. (See p. 255, first paragraph.)

*Ham* v. *State*, 18 How. 126, merely decides that the land in question was not "sold or reserved" when the school land grant of section sixteen was made, and so was not excepted from that grant.

*Doe* v. *Wilson*, 23 How. 457, only holds that deed of Petchi-co to defendant's grantors (with full covenants of warranty) of the two sections reserved to him by the treaty— said deed being made before survey and selection of these sections—passed the title to said sections as soon as they were surveyed, selected, and patented. The "tenancy in common" of Pet-chi-co with the United States, spoken of in the case, is based only upon the fact that the land was "reserved" to him when the Indian title passed to the United States by the same treaty which made the reservation; not upon the mere fact that he had a right to the two sections when they should be selected. (*Kissell* v. *The Schools*, 18 How. 19.)

Grant of out lots to St. Louis by the United States by Act of 1812, held to vest title thereto in said city before the United States survey. But those out lots existed, with well defined boundaries, when the granting Act passed. The United States survey was made not to create them, but to ascertain their boundaries and connect them with the general system of United States surveys.

*Wolcott* v. *Des Moines Co.*, 5 Wall. 68, only holds that certain lands, although not included in prior grant, were in such sense reserved by action of the United States Land Department as not to pass by subsequent Act granting lands in aid of a railroad, enacted while they were so reserved by the Commissioner.

*Veeder* v. *Guppy*, 3 Wis. 502, decides simply that the State, by a statute passed before selection or survey of lands granted "in alternate sections" by the United States to the State of Wisconsin, gave to a preëmptor under such statute a right to purchase, which took precedence of others, when the selection and survey were made. There are in the case some *obiter dicta* about the State being a "tenant in common" with the United States, as to the land from which the grant was to be selected—from the acceptance of the grant until survey and selection. But it is enough to say of that *dictum*, that the doctrine, if carried out, would make the State of California a tenant in common with the United States of every township in the State until survey. So complete a *reductio ad absurdum* needs no further illustration.

*Dubuque and Pacific R. R. Co.* v. *Litchfield*, 23 Howard, 26. This case has only a local bearing; it merely holds that a certain grant of lands made to Iowa, to improve the navigation of Des Moines River, extended only to Raccoon Fork. It does, however, lay down one general rule of some importance to us—that a grant to the State from the United States must be construed strictly. (Warren Bridge Case, 11 Peters, 420; *Rutherford* v. *Greene*, 2 Wheaton, 196.) This

case holds that under a grant of twenty-five thousand acres made to the heirs of General Greene by the State of North Carolina, title vested upon survey and allotment being made—no patent being necessary to complete the grant.

The legislation of the United States shows clearly that Congress has always considered the title to unsurveyed land as remaining in the United States until survey, even though upon survey such land should prove to be in a section sixteen or thirty-six. And in many cases the right has been, by Acts of Congress, expressly given to preëmptors to settle on land which might prove upon survey to be in such section. (Act of March 3d, 1857, 11 Stats. 254, 255; 1 Lester, 285, No. 320; Act of February 26th, 1859, 11 id. 385; Act of May 30th, 1862, 13 id. 410; 3 id. 517, 789, 307; 5 id. 502.)

The language of section seven of the Act of March 3d, 1853, was borrowed from section six of the Florida Act of 4th August, 1842 (5 Stats. at Large, 502), and is also carried into the Minnesota, Kansas, and Nebraska Acts (11 Stats. at Large, 254), and came back again to California in the Act of 1862. (See 12 Stats. at Large, 410.)

*Bodley & Rankin,* for Respondent.

Counsel for appellant assume to construe the seventh section of the Act of Congress of May 30th, 1862, as applicable to California, and say that "the section refers to the privilege as it existed in certain States and Territories, without naming them. We are, therefore, to look for the laws there in force, allowing preëmption claim and settlements on unsurveyed public lands," etc. We are referred to the Act of July 22d, 1854, in regard to New Mexico, Kansas, and Nebraska. (Lester, Vol. 1, pp. 231, 232, Secs. 5, 7.) If this law is the one relied on by appellant as the one referred to in section seven, what does the fourth section of that Act mean when it says: "That none of the provisions of this Act shall extend to mineral or school lands, saline, military, or other

reservations," etc.? It means simply this — that sections sixteen and thirty-six, which are reserved for school purposes by section five of the Act to which we are referred, are not liable to be settled or preëmpted, for the fifth section says, "that these sections (sixteen and thirty-six) shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territories, and in the States and Territories hereafter to be erected out of the same."

The Court will perceive the difference between the language of the Act last quoted and the sixth section of the Act of Congress of March 3d, 1853. By the Act of 1853 the sixteenth and thirty-sixth sections are granted to the State, as we shall hereinafter show *in presenti*. When, by the Act quoted, these sections are reserved, and when surveyed by the Government, to be applied, etc.—not granted, or pretended to have been granted.

The legal question which we are to discuss is, "whether Congress had the power to grant the right to settle upon sections sixteen and thirty-six, in this State, after the expiration of the time mentioned in section six of the Act of Congress of March 3d, 1853." We submit it had not. That it is a grant to the State of California of the sixteenth and thirty-sixth sections, *in presenti*, is not an open question. (*Doll* v. *Meador*, 16 Cal. 276; *Van Valkenburg* v. *McCloud*, 21 Cal. 330; 5 Howard, 447; 25 Cal. 252.)

But counsel say that the sixteenth and thirty-sixth sections are not capable of clear identification, and "are a mere myth, and may never come into existence," etc. The transcript in this cause shows that the township lines had actually been run on the ground prior to the grant, in 1853, establishing, beyond cavil, the southeast corner of section thirty-six, which is the extreme southeast corner of all townships. The law at the date of the grant clearly defined what a section of land was, viz: one mile square. Now, when we have the mile on the east line and the south line of this

section actually established at the time of the grant, is it uncertain where the parallel lines to make the square will run?

The Act of September 28th, 1850, granting to the State the swamp and overflowed lands, was a valid and present grant. (See *Sumner* v. *Dickinson*, 9 Cal. 554; *Owen* v. *Jackson*, 9 Cal. 322; *Kernan* v. *Griffith*, 27 Cal. 88, and other cases.)

A legislative grant is an executed contract, and we submit when Congress passed the Act of 1853, granting these lands with the reservation of one year only, within which settlement could be made thereon, it parted with its title; and it might as well declare that a third party should possess the land granted, and direct the mode of its transfer to them, as to declare that the original grantor should stand seized of the same. Nor is there any difference in the inviolability of the contract between a grant of property to an individual and a like grant to the State; and however great the control of Congress over the State, it can be exercised only in subordination to the principle which secures the inviolability of its contracts.

But supposing, for the sake of argument, the position assumed by appellant, viz: That the Act of 1853 was a grant to take effect after the survey of the respective townships, is correct, it would leave him in no better position than to give it the construction we contend for. The doctrine of relation must certainly apply in this case, and by it it is held " where a number of acts are to be performed, in virtue of which a right accrues, the time of the performance of the last act, when all have been performed in good faith, relates back to the commencement of the series of acts which create the right, so as to make it perfect when the first act was being commenced;" or, as stated in Viner's Abridgement, Tit. "Relation," 290, "where there are divers acts concurrent to make a conveyance, estate, or other

thing, the original act shall be preferred, and to this the other act shall have relation." (3 Cowen, 75, and cases there cited.) Therefore, whenever the official survey of this township took place, the right of the State by relation dated back to the signing of the Act by the President on March 3d, 1853.

We have been referred to no law, nor are we aware that any such exists, by which any new compact, or any compact, has arisen between the Federal Government and this State other or different from the grant of 1853, except that on the 1st of May, 1854. (10 U. S. Stats. 268.) Congress attempted to extend the time of settlement provided in the sixth section of the Act of 1853, for one additional year, which is proof that Congress did not interpret the seventh section of the Act of 1853, as appellant's counsel do.

By the Court, RHODES, J.:

This action was brought for the recovery of the possession of the southwest quarter of the southeast quarter of section thirty-six, township five south, range one east, Mount Diablo meridian.

The plaintiff claims title under a patent issued to him by the United States on the 15th day of May, 1869.

The defendant claims title under a patent issued to him by this State on the 6th day of January, 1869.

The plaintiff offered to prove that the land was not surveyed by the United States until about August 11th, 1866, when the official township plat was filed in the Land Office at San Francisco; that he settled on the land described in his patent—the north half and the southwest quarter of the southeast quarter of said section thirty-six—as early as the 20th day of December, 1862, and has ever since resided

thereon; that he filed his preëmption claim on said land November 6th, 1866, and thereafter made proof and payment therefor, and received a duplicate preëmption certificate upon which his patent issued. The Court excluded the evidence.

One of the questions arising upon this ruling of the Court, considered in connection with the evidence which had been admitted, is whether the title to these lands was in the United States at the time when the patent was issued to the plaintiffs or whether it had before that time vested in this State. That is the most important question in the case, and as there are other controversies in this State involving the same question, it is important that it be settled without any unnecessary delay. And if our conclusion be wrong the Supreme Court of the United States may readily correct it.

The sixth section of the Act of Congress of March 3d, 1853 (10 U. S. Stats., 246), provides that "all the public lands in the State of California, whether surveyed or *unsurveyed*, with the exception of sections sixteen and thirty-six, which *shall be and hereby are granted* to the State for the purposes of public schools in each township, * * * shall be subject to the preëmption laws of the 4th of September, 1841," etc. It is provided by section seven of that Act "that where any settlement, by the erection of a dwelling house or the cultivation of any portion of the land, shall be made upon the sixteenth or thirty-sixth sections before the same shall be surveyed * * * other land shall be selected by the proper authorities of the State in lieu thereof," etc. The third proviso to the sixth section is as follows: "Provided, that nothing in this Act shall be construed to authorize any settlement to be made on any public lands not surveyed, unless the same be made within one year from the passage of this Act; nor shall any right of such settler be recognized by virtue of any settlement or improvement made of such unsurveyed lands subsequent to that date."

This proviso was extended by the Act of March 3d, 1854, so as to permit settlements to be made on unsurveyed land within two years after the passage of the Act. There is only one other Act of Congress which purports to grant permission to settle upon and acquire preëmption rights to unsurveyed land in this State, and that is the Act of May 30th, 1862 (12 U. S. Stats., p. 409). The first clause of the seventh section is in these words: "That in regard to settlements which by existing laws are authorized in certain States and Territories upon unsurveyed lands, which privilege is hereby extended to California," the preëmption claimant is required to file his declaratory statement within a certain time mentioned in the section. We are referred by counsel to several Acts then in force, which granted the right of preëmption of unsurveyed land; and among others are the Act of August 4th, 1854, "to extend the right of preëmption over unsurveyed lands in Minnesota, and for other purposes" (10 U. S. Stats., 576); the Act of July 17th, 1854, concerning public lands in Oregon (10 id., 305); the Act of July 22d, 1854, to establish the offices of Surveyor General in New Mexico, Kansas, and Nebraska (id. 308, Sec. 7); and the resolution of March 3d, 1857, relative to sections sixteen and thirty-six, in the Territories of Minnesota, Kansas, and Nebraska (11 id. 254). These Acts authorize settlements to be made on unsurveyed land in the Territories mentioned in the respective Acts, and the last refers specially to sections sixteen and thirty-six.

It was held by this Court in *Higgins* v. *Houghton*, 25 Cal. 252, that the Act of Congress of March 3d, 1853, vested in this State the title to the sixteenth and thirty-sixth sections in each township; that the power of locating the land granted, by means of a survey of the public lands, was reserved to the General Government, and, "as fast as townships thereafter were surveyed and sectionized, that the State became the owner of the sixteenth and thirty-sixth

sections absolutely, not only as to quality, but as to position also." In support of that position the Court cited *Doll* v. *Meador*, 16 Cal. 296; *Van Valkenburg* v. *McCloud*, 21 Cal. 330; and *Foley* v. *Harrison*, 15 How. 447; and the Court added "that by the grant of the sixteenth and thirty-sixth sections to the State in full property, they were effectually withdrawn from the operation of the Acts relating to preemptions." The lands in controversy *were mineral lands.* The grants, so far as respects the *location* of the lands granted, was of course subject to the exception of lands reserved by competent authority, and lands to which a valid right of preëmption should attach, under the provisions of the Act, prior to the survey—that is to say, the lands to which a valid right of preëmption might be acquired by means of a settlement which had already been made, or which might be make within one year after the passage of the Act.

The words of grant in the swamp land Act of Congress of the 28th of September, 1850, are that the lands "shall be and the same are hereby granted to said State."

In *Summers* v. *Dickinson*, 9 Cal. 554, and *Owen* v. *Jackson*, id. 322, it was held that those words imported a present grant; and in *Keeran* v. *Griffith*, 27 Cal. 87, this Court reviewed the question, and again came to the conclusion that the Act operated as a full and perfect conveyance *in presenti.* The plaintiff in the last case claimed title under a patent issued by the State as for "swamp and overflowed land," and the defendant claimed title by virtue of an entry under the Homestead Act of 1862, the entry being subseqüent to the date of the patent issued by the State.

The question as to the construction of the swamp land Act of 1850 was again considered in *Robinson* v. *Forrest*, 29 Cal. 317. The plaintiff claimed title under a swamp land patent, and the defendant had entered on the land while it was unsurveyed, claiming the right of preëmption. The Court gave the same construction to the Act as was given in *Kee-*

*ran* v. *Griffith,* but with a qualification in respect to certain parcels of swamp and overflowed land, which is not material to the question now before us. The question as to whether after the swamp land Act of 1850 Congress had competent authority to grant the privilege of acquiring rights in those lands under the preëmption or homestead laws, was not considered in those cases, nor in view of the construction which the Court gave to the Act, would it seem necessary to have done so, for it would be a palpable contradiction in terms, to say that the Act operated as a grant *in presenti* of the " swamp and overflowed lands," and at the same time hold that Congress might change, impair, or destroy the grant by creating further limitations, reservations, or exceptions, or by conferring on other parties the title, or the right or privilege of acquiring the title, to the same lands.

Accepting as correct the construction of the words of the sixth section of the Act of March 3d, 1853, as announced in *Higgins* v. *Houghton, supra,* our conclusion is that the title to each sixteenth and thirty-sixth section, upon its being surveyed, vested absolutely in the State; that Congress had no power after the passage of that Act to impair the grant or prevent the title to those sections upon their being surveyed from vesting in the State; and that therefore the Act of Congress of May 30th, 1862, did not have the effect to extend the right of preëmption over those sections.

Judgment and order affirmed.