In the matter of the investigation of alleged unfair methods of competition and unfair acts in the importation and sale of synthetic phenolic resin, Form C, and articles made wholly or in part thereof (No. 3009[1])

FRISCHER & CO. (INC.), RANDES IMPORTING CO., TRANSATLANTIC CLOCK & WATCH CO. (INC.), WESTERN BRIAR PIPE CO., NATIONAL COUNCIL OF IMPORTERS AND TRADERS (INC.), APPELLANTS

[1] T. D. 42827.

United States Court of Customs Appeals, May 25, 1928

*Meyer Kraushaar* and *W. Lee Helms* (*Meyer Kraushaar* of counsel) for appellants.

*Barnes, McKenna & Halstead* (*Albert MacC. Barnes, jr.*, and *Samuel M. Richardson* of counsel) for appellees.

*James W. Bevans* and *Charles D. Lawrence, amici curiae.*

[Oral argument December 22, 1927, by Mr. Kraushaar and Mr. Barnes, jr.]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

In the above entitled matter the Bakelite Corporation et al., styling themselves "Appellees," moved for an order dismissing the above entitled appeal upon the ground that the court has no jurisdiction to entertain the same.

On the 16th day of December, 1925, the Bakelite Corporation, having its principal place of business in the city of New York, and certain of its subsidiaries and consumers filed a complaint with the

United States Tariff Commission, complaining of certain unfair methods of competition and unfair acts tending to injure their business of manufacturing and selling articles composed of synthetic phenolic resin, to which had been given the name "Bakelite" after the name of its alleged inventor, Dr. Leo Bakeland. The complaint proceeded upon the theory that the faceted beads and other articles made of synthetic phenolic resin imported were being imported in violation of certain patent rights possessed by the Bakelite Corporation. The complaint was made pursuant to the provisions of section 316, subdivision (b) of the Tariff Act of September 21, 1922.

The tariff commission thereupon made a report to the President that it had investigated the complaint, and made and submitted findings to the effect that there was prima facie reason to believe that section 316 of the tariff act in question was being violated, and recommended that the Treasury Department forbid the entry of such articles until such investigation as the President might deem necessary might be completed, and recommended that the President request the Secretary of the Treasury to forbid such entry. Acting upon such report, the President did direct the Secretary of the Treasury to issue an embargo against the commodity.

The commission thereupon published a notice directing that all persons interested in the proceedings show cause why the prayer for relief sought in the complaint should not be granted.

Frischer & Co. (Inc.) et al., the respondents, known as appellants in this action, appeared and filed a verified answer denying the complaint, setting up that the Bakelite Corporation did not operate the business efficiently or economically; that the patents upon which they relied were invalid; that there was no infringement of the patents; that the violation of a patent law was not an unfair method of competition, and other claims.

The Bakelite Corporation appeared before the commission by counsel and lengthy hearings were had, and on the 25th day of May, 1927, the commission made its findings and recommendations, in which it expressly found that the provisions of the statute were broad enough to invest it with jurisdiction to declare that the infringement of the patent rights was an unfair method within the meaning of the statute. Certain other findings and recommendations were made, not material here.

From these findings and recommendations an appeal was taken to this court under subdivision (c) of section 316, *supra*, upon 35 assignments of error.

Frischer & Co. (Inc.) et al., at the time of the argument of the motion to dismiss, made what they style a cross-motion to strike out the appearance of Barnes, McKenna & Halstead as attorneys for the

194

Bakelite Corporation, on the ground that the same is unauthorized
by statute, which latter motion the court now overrules.

Before setting out the reasons assigned by the Bakelite Corporation
et al. why this court was without jurisdiction to hear the appeal, we
deem it proper to set out in full the parts of the Tariff Act of 1922
under which the actions of the tariff commission and the appeal to
this court were taken:

SEC. 316. (a) That unfair methods of competition and unfair acts in the
importation of articles into the United States, or in their sale by the owner,
importer, consignee, or agent of either, the effect or tendency of which is to
destroy or substantially injure an industry, efficiently and economically operated,
in the United States, or to prevent the establishment of such an industry, or to
restrain or monopolize trade and commerce in the United States, are hereby
declared unlawful, and when found by the President to exist shall be dealt with,
in addition to any other provisions of law, as hereinafter provided.

(b) That to assist the President in making any decisions under this section
the United States Tariff Commission is hereby authorized to investigate any
alleged violation hereof on complaint under oath or upon its initiative.

(c) That the commission shall make such investigation under and in accord-
ance with such rules as it may promulgate and give such notice and afford such
hearing, and when deemed proper by the commission such rehearing with op-
portunity to offer evidence, oral or written, as it may deem sufficient for a full
presentation of the facts involved in such investigation; that the testimony
in every such investigation shall be reduced to writing, and a transcript thereof
with the findings and recommendations of the commission shall be the official
record of the proceedings and findings in the case, and in any case where the
findings in such investigation show a violation of this section, a copy of the
findings shall be promptly mailed or delivered to the importer or consignee of
such articles; that such findings, if supported by evidence, shall be conclusive
except that a rehearing may be granted by the commission, and except that,
within such time after said findings are made and in such manner as appeals
may be taken from decisions of the United States Board of General Appraisers,
an appeal may be taken from said findings upon a question or questions of
law only to the United States Court of Customs Appeals by the importer or
consignee of such articles; that if it shall be shown to the satisfaction of said
court that further evidence should be taken, and that there were reasonable
grounds for the failure to adduce such evidence in the proceedings before the
commission, said court may order such additional evidence to be taken before
the commission in such manner and upon such terms and conditions as to the
court may seem proper; that the commission may modify its findings as to the
facts or make new findings by reason of additional evidence, which, if supported
by the evidence, shall be conclusive as to the facts except that within such time
and in such manner an appeal may be taken as aforesaid upon a question or
questions of law only; that the judgment of said court shall be final, except that
the same shall be subject to review by the United States Supreme Court upon
certiorari applied for within three months after such judgment of the United
States Court of Customs Appeals.

(d) That the final findings of the commission shall be transmitted with the
record to the President.

(e) That whenever the existence of any such unfair method or act shall be
established to the satisfaction of the President he shall determine the rate of
additional duty, not exceeding 50 nor less than 10 per centum of the value of

such articles as defined in section 402 of Title IV of this act, which will offset such method or act, and which is hereby imposed upon articles imported in violation of this act, or, in what he shall be satisfied and find are extreme cases of unfair methods or acts as aforesaid, he shall direct that such articles as he shall deem the interests of the United States shall require, imported by any person violating the provisions of this act, shall be excluded from entry into the United States, and upon information of such action by the President, the Secretary of the Treasury shall, through the proper officers, assess such additional duties or refuse such entry; and that the decision of the President shall be conclusive.

(f) That whenever the President has reason to believe that any article is offered or sought to be offered for entry into the United States in violation of this section but has not information sufficient to satisfy him thereof, the Secretary of the Treasury shall, upon his request in writing, forbid entry thereof until such investigation as the President may deem necessary shall be completed: *Provided,* That the Secretary of the Treasury may permit entry under bond upon such conditions and penalties as he may deem adequate.

(g) That any additional duty or any refusal of entry under this section shall continue in effect until the President shall find and instruct the Secretary of the Treasury that the conditions which led to the assessment of such additional duty or refusal of entry no longer exist.

Briefly stated, the position of the Bakelite Corporation et al. is that the matter before the court now is not a "case" or a "controversy" within the meaning of section 2 of Article III of the Constitution of the United States and that the United States Court of Customs Appeals, being an inferior court, created by Congress, under and by virtue of the authority of section 1 of Article III of the Constitution, can only hear "cases" and "controversies" such as are provided for in said section 2.

The pertinent portions of the Constitution in the determination of the question before us are as follows:

### ARTICLE III

Section 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

\*     \*     \*     \*     \*     \*     \*

ARTICLE 1

"Section 8. The Congress shall have Power * * *
*         *         *         *         *         *         *
"To constitute Tribunals inferior to the supreme Court;
*         *         *         *         *         *         *

Both sides to the controversy, including *amicus curiae*, concede that the United States Court of Customs Appeals is an inferior court, created under and by virtue of the provisions of said Article III of the Constitution, and that the jurisdiction of this court is limited to the consideration of such "cases" and "controversies" as are provided for in section 2 of said article. The difference of opinion between the parties seems to be entirely confined to the question as to whether the matter before us is or is not such a "case" or "controversy."

It is at once apparent that if this court is not limited in its juris- diction to the class of "cases" and "controversies" referred to in Article III, then there is no reason why it may not properly consider administrative appeals or appeals involving almost any kind of disputed question, when so directed by Congress. We think it proper, therefore, to attempt to definitely determine under what con- stitutional grant of power Congress was acting when it created this court, before proceeding to the determination of the question as to whether the appeal to this court submits to it for decision such a "case" or "controversy."

When Congress creates a court, obviously it must do so by virtue of some powers conferred upon it by the Constitution. We think Article I, section 8, where it provides that "the Congress shall have power * * * to constitute Tribunals inferior to the supreme Court," grants no further court-creating powers than those provided for in Article III. See Story on the Constitution, 5th ed., vol. 2, sec. 1579; and Walker's American Law, 6th ed., p. 108; and Watson on the Constitution, vol. 2, p. 1065.

It may be argued that Congress has the power to create certain courts or judicial tribunals by virtue of certain implied grants of the Constitution aside from any powers expressly conferred by Article III; that is to say, that the right to establish complete claims-settling machinery, including that of a judicial tribunal, goes with the grant of the right expressly granted to pay debts, and that in the same manner Congress has the implied power to create an appellate judi- cial tribunal to adjudicate matters arising out of the collection of income taxes and out of the collection of customs duties, etc. Regard- less of what may be said and what has been said about the lack of implied powers where the Constitution speaks definitely in granting powers, and the lack of power in Congress to confer any part of the judicial powers of the United States upon any tribunal other than an inferior court, we do not regard it as necessary to the decision

of this issue to pass upon the merit or lack of merit of such contentions. See *American Insurance Co.* v. *Canter*, 1 Pet. 511–545.

As we view it, this court either was or was not created on August 5, 1909, under and by virtue of the power granted to Congress in Article I, section 8, and Article III, *supra*. If it was created under and by virtue of such power, we think it follows, beyond plausible controversy, that it is limited in its jurisdiction to such "cases" and "controversies" as are specified in section 2 of Article III. To this effect are the latest and most apt pronouncements of the Supreme Court and which may be found in *Muskrat* v. *United States*, 219 U. S. 346; *Postum Cereal Co.* v. *California Fig Nut Co.*, 272 U. S. 693; and *Liberty Warehouse Co. et al.* v. *Grannis*, 273 U. S. 70.

While there has been considerable said in some of the decisions of the Supreme Court, in connection with matters somewhat unrelated to the issues at hand, relative to a distinction existing between the limitation on the jurisdiction of the Supreme Court under Article III and the limiting effect of such article on the jurisdiction of inferior courts *Gordon* v. *United States*, 117 U. S. 697, and while suggestions have been made indicating that there may be "inferior" courts other than those in contemplation in Article III, we think that the decisions of the Supreme Court have definitely settled the proposition that the limitations of Article III on jurisdiction, as well as the provisions for salary and tenure of office, apply with as much force to an inferior court, created under Article III, as to the Supreme Court. *Liberty Warehouse Co. et al.* v. *Grannis, supra; Keller et al.* v. *Potomac Electric Power Co. et al.*, 261 U. S. 428.

In order to determine its jurisdiction, therefore, any United States court called upon to construe the laws of the United States, such as the one at bar, must necessarily first determine under what constitutional power it was created, in order to determine whether or not it is subject to the limitations as to jurisdiction prescribed by the Constitution. In this connection the court must inquire what *was* done, and not what *may be* done. In doing so resort may be had not only to the context of the act of creation but to the legislative history, committee reports, and other similar legislation involving the creation of courts and tribunals. After a careful examination into all of these facts, many considerations bring us to the conclusion that this court was created under and by virtue of the authority of Article III of the Constitution, and by no other authority, and some of which considerations we deem it advisable to enumerate.

The pertinent portions of section 29 of the Tariff Act of 1909 (H. R. 1438), in which act this court was brought into existence, are too long for quotation here. The act itself is referred to hereinafter in preference to the codes of 1911 and 1926, since the codes have slightly changed some of the original expressions.

It will be observed that in the creation and establishment of this court no jurisdiction was given to it except in "cases." In its original creation it was not within the contemplation of its creators to confer upon it jurisdiction to try administrative questions or matters not embraced within the terms of section 2 of Article III. Every case given to it *arises* under "the laws of the United States." It will be noted further that it was styled the "United States Court of Customs Appeals," and that its members were designated as "a presiding judge and four associate judges"; that it should be "a court of record, with jurisdiction as hereinafter established and limited"; that its "judgment or decrees  *  *  *  shall be final."

Its jurisdiction was carved out of the jurisdiction of the circuit courts and circuit courts of appeals, and it not only took the jurisdiction formerly entertained solely by the circuit courts and circuit courts of appeals, but its jurisdiction was made final, even denying litigants the right of appeal to the Supreme Court. The law was, in 1914, amended to provide a very limited right of appeal to the Supreme Court. The judges were to receive compensation of $10,000. The act provided that upon the temporary inability or disqualification of one or two judges of said court, that the President of the United States might designate any qualified United States circuit or district judge or judges to act in his or their place. It is furthermore to be observed that its jurisdiction was exclusively appellate, and that it was authorized not only to sit in Washington, but also to sit anywhere in the United States, "in the several judicial circuits."

In determining whether a court is an inferior court created under and subject to the provisions of Article III of the Constitution, the Supreme Court has given almost controlling influence to the tenure of office of the judges which was either given by or omitted from the act creating the court. *McAllister* v. *United States*, 141 U. S. 174, 184–186.

The imperative need of life tenure for the judges of the United States Court of Customs Appeals, the jurisdiction of which is co-extensive with the Nation and which decides cases which are ofttimes directly concerned with great public issues and issues of vast financial and economic importance, need not be discussed here further than to say that at least equally important reasons exist for a judge of this court to be "perfectly and completely independent, with nothing to influence or control him but God and his conscience" as were under consideration in *Evans* v. *Gore*, 253 U. S. 245. See remarks by Chief Justice Marshall, Debates Va. Conv., 1829–1831, pp. 616, 619; Alexander Hamilton in Federalist, No. 79.

An examination of the legislative procedure incident to the enactment, by Congress, of section 29 of H. R. 1438, being what is commonly known as the Payne-Aldrich Tariff Act, in July, 1909, the

debates in the Senate on July 7, 1909, the Senate committee report, and other relevant legislative matters we think indisputably shows that the framers of the law thought they were, and in fact were, creating a court whose judges would have a *life tenure in office.* The committee report sets up that one of the reasons for creating the court was that if able men devoted a lifetime to the service, they would become highly efficient in the highly technical jurisprudence incident to the settlement of customs controversies. The judges of such court were commissioned for life. *Nowhere in the statute creating this court, or in any other law, is life tenure or service during good behavior of its judges expressly granted,* nor is any definite tenure granted.

From what source, may we inquire, were the judges of this court given tenure during good behavior? There can be but one answer. Being an inferior court, created under section 1 of Article III of the Constitution, and, as such, exercising a portion of the judicial powers of the United States, said section, by its express terms, authorized said judges to "hold their offices during good behavior." *McAllister* v. *United States, supra.* The two clauses in section 1 of Article III— diminution of salary and life tenure—are coupled together in "place" and "purpose." *Evans* v. *Gore, supra.* It seems axiomatic that if the tenure of office and compensation provisions of Article III apply to a court created under the article, that by the same token the limitations and prescriptions as to jurisdiction shall also apply. This conclusion seems irresistible.

Following this reasoning, it ensues that if the United States Court of Customs Appeals was not created under the authority of Article III and, therefore, not subject to and limited by the provisions of the article, that there was no tenure of existence given to its judges by legislative act, nor extended to them by the Constitution, and it would be a mere administrative tribunal created under some indefinite powers of Congress, to be re-created, if its existence is deemed essential, at the beginning of each succeeding term of Congress, and its judges would be subjected to the very things the framers of the Constitution, in providing for inferior courts with similar jurisdiction, sought to provide against. See Wilson's Constitutional Government in the United States, pp. 17, 142.

Here it might be well to say that the legislative proceedings in connection with the establishment of this court disclose that the section of the act creating this court was not passed by the Congress without a decided division of sentiment. See proceedings in the United States Senate and the Senate Finance Committee Report found on p. 4320 of vol. 44 of the Congressional Record of the 61st Cong., 1st sess., July 7, 1909.

The force of the contention that the judges of the United States Court of Customs Appeals have life tenure by virtue only of Article

III of the Constitution is strengthened by the consideration of the fact that in the creation of the United States Circuit Court of Appeals and the United States District Courts, the judges also were given no definite tenure of office. See U. S. Stat. L., vol. 26, p. 286, and R. S. (1878), sec. 551, p. 93. Congress obviously relied upon the fact that Article III of the Constitution extended this tenure to them. As far as we know, it never has been contended anywhere that circuit courts of appeals and United States district courts were created under any other authority than Article III of the United States Constitution.

It is interesting to note, in this connection, that the Court of Claims was originally created to consider matters which were not "cases" and "controversies," and that its jurisdiction was advisory and ancillary only. *United States* v. *Klein*, 13 Wall. 128, 144; *In re Sanborn*, 148 U. S. 222; *Gordon* v. *United States*, *supra*. The Supreme Court of the District of Columbia and the Court of Appeals of the District of Columbia were expressly given a tenure during good behavior, by the statute which created them. See Act of March 3, 1863, 12 Stat. L., 762, and Act of February 9, 1893, 27 Stat. L., 434.

In *McAllister* v. *United States*, *supra*, the giving or withholding express tenure of office to a judge in creating a court by Congress was regarded as of controlling effect in determining the character of the court. In that case a Territorial judge, for the Territory of Alaska, was removed from office by President Cleveland, under the authority of a statute of Congress, before the expiration of the judge's term of office.

It was contended that the President had no authority and that Congress could give him no authority to remove a judge except in the constitutional manner. The Supreme Court held that he was a Territorial or legislative judge, and not a constitutional judge, and in the course of reaching this conclusion the court said:

For the reasons we have stated it must be assumed that the words "judges of the courts of the United States," in section 1768, were used with reference to the recognized distinction between courts of the United States and merely Territorial or legislative courts.

This view, it is contended, is not supported by the history of congressional legislation relating to the organization of courts in the Territories. We do not assent to this proposition. The acts providing for courts in the Territories of Orleans, Iowa, Minnesota, New Mexico, Utah, Colorado, Nevada, Dakota, and Arizona fixed the tenure of office for judges in those Territories, respectively, at four years. Those providing for courts in the Territories of Missouri, Arkansas, Florida, Oregon, Washington, Nebraska, Kansas, Idaho, Montana, Wyoming, and Oklahoma fixed the tenure of judges at four years, with the addition, in some cases, of the words, "unless sooner removed"; in others, of the words, "unless sooner removed by the President," or "and no longer," or "and until their successors shall be appointed and qualified," or "unless sooner removed

by the President with the consent of the Senate." Of course, Congress would not have assumed, in the acts providing for courts in the Territories named, to limit the terms of the judges, in the modes indicated, *if it had supposed that such courts were courts of the United States of the class defined in the first section of article three of the Constitution, the judges of which hold, beyond the power of Congress to provide otherwise, during good behavior.* Nor is the view that courts in the Territories are legislative courts, as distinguished from courts of the United States, weakened by the circumstances that Congress, in a few of the acts providing for Territorial courts, fixed the terms of the office of the judges of those courts during "good behavior." As the courts of the Territories were not courts the judges of which were entitled, by virtue of the Constitution, to hold their offices during good behavior, it was competent for Congress to prescribe the tenure of good behavior, as in the acts last referred to, or to prescribe, as in the other acts above referred to, the tenure of four years and no longer, or four years unless sooner removed, or four years unless sooner removed by the President, or four years unless sooner removed by the President with the consent of the Senate, or four years and until a successor was appointed and qualified. (Italics ours.)

The last above-cited case and this line of reasoning would seem to afford complete authority for the conclusion that in creating the Court of Claims and in providing for it a jurisdiction which did not measure up to the requirements of Article III Congress did not contemplate that its judges would have a life tenure by virtue of Article III, and that, since life tenure for its judges was desired, it was necessary to expressly grant it in the act. It follows that the express grant of life tenure in this and other creative acts was not an unintentional or unnecessary provision, but was an essential one, if life tenure was desired, and that such expression points unmistakably to the kind of courts created and to the source of the power invoked in their creation.

In considering the effect of the various expressions of the Supreme Court of the United States as affecting the issue here under consideration, we have not overlooked the following statement in *Miles* v. *Graham*, 268 U. S. 501:

\* \* \* It is equally clear, we think, that there is no power to tax a judge of a court of the United States on account of the salary prescribed for him by law.

We have also considered the possible deduction that might be drawn from this statement when considered with the finding of the court in the case of *James* v. *United States*, 202 U. S. 401, or with the reference, by Chief Justice Taft, to "United States Judges" in the great recent case of *Myers* v. *United States*, 272 U. S. 52, 155. We think, however, that the use of the words "a court of the United States," in the *Miles* case, had reference to such an inferior court as comes within the provisions of Article III.

Without citing all the authorities pertinent, we think that Congress may, by appropriate legislation, so change the jurisdiction and powers of a judicial tribunal, which is not an inferior court, as to

make it an inferior court, and which court, after such change, will be subject to the limitations of Article III of the Constitution. *United States* v. *Klein, supra,* seems to settle this definitely.

The Court of Claims was expressly given a life tenure in the act which created it. Sec. 1049, p. 194, R. S., Act of February 24, 1855. For many years the Supreme Court held that the Court of Claims might consider matters which Article III of the Constitution prevented the Supreme Court from considering. *In re Sanborn,* petitioner, *supra; Gordon* v. *United States, supra.* Later legislation brought to the Court of Claims a class of cases which the Supreme Court, under its amended rules, regarded as of such character that there was no constitutional inhibition against its considering them on appeal (*De Groot* v. *United States,* 5 Wall. 419; *United States* v. *Klein, supra*), although the judgment of the Court of Claims or the Supreme Court, in such cases, was not subject to "award of execution." Congress could withhold or grant authority to pay. Thus we have an example of a judicial tribunal, obviously created under powers other than those provided for in Article III, being given a class of cases or a status which entitled it to be regarded as an inferior court under Article III (*Miles* v. *Graham, supra*) and its judgments to be subject to review by the Supreme Court.

While the last cited case does not affirmatively say that the Court of Claims was created under the powers granted to Congress, in Article III of the Constitution, to create inferior courts, it does hold that Article III of the Constitution prevented Congress from diminishing the salary of the judges of the Court of Claims during their continuance in office, which seems to us is, in effect, a holding that the Court of Claims, as now constituted, having the protection of the provisions of Article III, as an inferior court, must necessarily be limited to the jurisdiction prescribed by such article.

In *Evans* v. *Gore, supra,* a judge of a United States district court for the Western District of Kentucky was held to be exempt from paying income tax on his salary by reason of the provision of Article III of the Constitution, which provides that the compensation of the judges "shall not be diminished during their continuance in office." A district court is an inferior court of the United States. Inferior courts are "ordained and established" by Congress, and not by the Constitution. Congress has never expressly given life tenure to the Supreme Court, the district courts, or the circuit courts of appeals. There is no reasonable room for contention that the Constitution does not give the judges of such courts life tenure. When Congress created the United States Court of Customs Appeals, it said no more and did no more, in indicating the kind of court it was creating, than it did when it created the circuit courts of appeals and the district courts.

During the entire history of customs jurisprudence litigants in customs cases have always been given, somewhere in the procedure provided by Congress, the opportunity to present the issues before an inferior court created under Article III of the Constitution. When this court was created appeal was provided from the Board of General Appraisers to the United States Court of Customs Appeals, and no further. If this court was not a part of the judiciary created under Article III, Congress, for the first time, denied customs litigants the privileges of an inferior court. Whether Congress has the right, under the Constitution, to deny customs litigants the right to submit their cases, of a certain character, to an inferior court we do not undertake to decide. Its doing so would be such a departure from the kind of legislation that it had enacted during a period of a century and a half as to point strongly, we think, to the fact that it did not intend such a result.

We are, therefore, brought to the irresistible conclusion that when Congress enacted the legislation which brought this court into existence it was proceeding under and by virtue of the authority extended to it by Article III of the Constitution and that we are, therefore, required to confine our jurisdiction to "cases" and "controversies" and for the same reasons as apply to other inferior courts and the Supreme Court.

It remains for us to determine whether or not the appeal in the instant case brings to us for review such a "case" or "controversy."

In determining this issue, we recognize that it may be difficult to harmonize the different expressions of the Supreme Court which may be applicable and that some doubt as to the correctness of our conclusion might be entertained. That it is our duty to resolve all reasonable doubts in favor of the validity of the congressional act is so fundamental and so well settled as to require no citation of authority. Equally clear and emphatic is the declared attitude of the Federal judiciary that United States courts will rigidly adhere to the jurisdictional limitations prescribed by the Constitution and will use great care to assert jurisdiction over no matter which, under the terms of the Constitution, is withheld from them. *Muskrat* v. *United States, supra.*

*Muskrat* v. *United States, supra,* is conceded to be the leading case on the question of what is or is not a "case" or "controversy." There Mr. Justice Day, after reviewing practically all the then existing authorities, quoted approvingly from Mr. Justice Field, of the Circuit Court, in the case of *In re Pacific Railway Commission,* 32 Fed. Rep. 241, 255, and adopted it as the language of the court as to the meaning and application of the term "cases" and "controversies." He quoted the following:

The judicial article of the Constitution mentions cases and controversies. The term "controversies," if distinguishable at all from "cases," is so in that it is less comprehensive than the latter, and includes only suits of a civil nature. *Chisholm* v. *Georgia*, 2 Dall. 431, 432; 1 Tuck. Bl. Com. App. 420, 421. By cases and controversies are intended the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs. Whenever the claim of a party under the Constitution, laws, or treaties of the United States takes such a form that the judicial power is capable of acting upon it, then it has become a case. The term implies the existence of present or possible adverse parties whose contentions are submitted to the court for adjudication.

In applying the *Muskrat* case to the facts in hand, we must not overlook the proposition that in that case the Supreme Court was called upon to review a decision by the Court of Claims predicated upon an act by Congress, which merely provided for the court passing upon the abstract question of whether or not a congressional enactment was valid under the Constitution, without there being any litigants in court, without anyone's rights being involved or anyone's status being up for determination, and that the court there said, in effect, that such an abstract question was in no sense a case or controversy. It will be noted that the definition quoted by Justice Day states that: "The term implies the existence of *present* or *possible* adverse parties whose contentions are submitted to the court for adjudication." (Italics ours.) The contentions of no one were directly involved in the matter and, therefore, it was not a case. See *California* v. *San Pablo & Tulare Railroad Co.*, 149 U. S. 308. The difference in the controlling facts before the court in the *Muskrat* case and the facts before this court now will appear as we proceed.

In the *Postum Cereal Co.* case, *supra*, the learned Chief Justice, speaking for the court, and in holding that, on account of the "case" and "controversy" provision of Article III, the Supreme Court was prohibited from considering the appeal, said:

* * * The decision of the Court of Appeals under section 9 of the act of 1905 is not a judicial judgment. It is a mere administrative decision. It is merely an instruction to the Commissioner of Patents by a court which is made part of the machinery of the Patent Office for administrative purposes. In the exercise of such function it does not enter a judgment binding parties in a case as the term case is used in the third article of the Constitution. * * * This result prevents an appeal to this court, which can only review judicial judgments. * * *

* * * For here the action of the Court of Appeals in its dismissal was dealing with something which, even if it should have been received, was not in the proper sense a judgment at all. Whatever the form of the action taken in respect of such an appeal, it is not cognizable in this court upon review, because the proceeding is a mere administrative one.

We submit that a very different situation prevails in the case at bar. Here are real parties litigant, whose rights and status are

vitally affected by the litigation. If the presence of parties to the action is the test, then the requirement is fulfilled in that particular., The legal question submitted for this court's decision is not academic or moot, and the rights of the litigants before us are vitally affected by the judgment of this court. A question of law, involving the construction of a "law of the United States," which prescribes the rights of the litigants, is here tried, in the regular form of judicial procedure, and when decided becomes a "final" judgment and the basis of future action.

We must bear in mind that the act under consideration definitely states "that the judgment of said court shall be final, except that the same shall be subject to review by the United States Supreme Court upon certiorari applied for within three months after such judgment of the United States Court of Customs Appeals," and we think that the judgment of this court, or the judgment of the United States Supreme Court, upon the question of law involved, is binding and final as to the whole world. The parties, under authority of a law of the United States, submitted to the tribunal below the initial determination of the question of unfair methods, etc. When the case reached this court on "a question or questions of law only" an important and valuable right between interested, present parties was to be adjudicated with "final" effect.

The question before us is: When the case reaches us is it a "case" or a "controversy"? It is not a question as to what it was in the tribunal below, but what it is when it reaches us. A long line of decisions of the Supreme Court holds that there are matters involving public and private rights, position, and status which, if presented in such form that the judicial power is capable of acting thereon, become susceptible of judicial determination and that such matters may be, by Congress, brought to the cognizance of inferior courts of the United States. *Tutun* v. *United States*, 270 U. S. 568; *Fidelity National Bank and Trust Co. of Kansas City et al.* v. *Swope et al.*, 274 U. S. 123; *Murray's Lessee et al.* v. *Hoboken Land and Improvement Co.*, 59 U. S. 272, 284; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; *United States* v. *Ritchie*, 17 How. 524; *La Abra Silver Mining Co.* v. *United States*, 175 U. S. 423, 453–457; *Fong Yue Ting* v. *United States*, 149 U. S. 698, 729.

We think, under the last-cited cases, the instant matter is presented in such a form as to call for the exercise of the judicial powers of this court in so far as the question involves the trial and adjudication, in a judicial procedure, of rights and privileges which by the judgment of this court is made "final" as to the matters involved as against all parties. Whether the importers are denied the right to import is not the question. But if it were, and their legal status had been

adjudicated, adversely to them, prevention from the continuance of such unlawful status, we think, might be had. *Marbury* v. *Madison*, 1 Cranch, 137, 170; *Field* v. *Clark*, 143 U. S. 649; *Hampton, jr., & Co.* v. *United States*, 14 Ct. Cust. Appls. 350, T. D. 42030; 275 U. S. —, 242. The parties have had their day in court where a definite, legal issue, involving a valuable right, is finally and judicially adjudicated. The status of the importers being thus finally and definitely fixed, as the basis of future action, what future action, if any, may be taken is, to the courts, of no concern.

Is the judgment of this court in the matter at bar a "judicial judgment" or an administrative decision within the meaning of the *Postum Cereal Co.* case, *supra?* We think it is the former, because it is the final, conclusive judicial determination of the fact as to whether or not the party has been guilty of unfair methods, etc., and a final and conclusive judgment applying the law to the facts, and, as such, it would be regarded as res adjudicata of that issue in any court whenever questioned. *Fidelity National Bank and Trust Co. of Kansas City et al.* v. *Swope et al., supra.* And, furthermore, it could not be collaterally attacked. If a "judicial judgment" be one which is final and conclusive as between the parties on the issues involved and not subject to collateral attack, then the judgment of this court in the matters now before it meets the test and is a "judicial judgment." Such a judgment does not have to be for money, or for the recovery of a thing, or involve anything that a writ or process may enforce, but may be the determination of a status, or a right, or a privilege, or "the basis of action." *Tuton* v. *United States, supra; Interstate Commerce Commission* v. *Brimson, supra; Fidelity National Bank and Trust Co. of Kansas City et al.* v. *Swope et al., supra.* The ultimate test is: Is the judgment final? *Postum Cereal Co., supra.*

The *Tutan* case involved the question as to whether an order of a district court granting or denying a petition for naturalization was a final decision and whether or not such a proceeding was a "case" within the meaning of Article III of the Constitution. A unanimous court held, in a very well written and well considered opinion, by Mr. Justice Brandeis, that such an order was a final decision and was a "case" within the meaning of Article III and within the meaning of the Judicial Code, and that such a case was reviewable by the Circuit Court of Appeals. No property rights were involved, but a status was to be determined, which status, however, when declared, could be revoked or a new application filed in the same or another court. Notwithstanding this fact, the court held, citing *Hayburn's* case, 2 Dall. 408; *United States* v. *Ferreira*, 13 How. 39; *Muskrat* v. *United States, supra*, that it was a case within the meaning of

Article III and was triable and reviewable by the inferior courts. The learned judge, speaking for the court, said:

\* \* \* The order granting or denying a petition for naturalization is clearly a final decision within the meaning of that section. *Ex parte Tiffany*, 252 U. S. 32. This is true, although a certificate granted may be canceled under section 15 of the naturalization act (*United States* v. *Ness*, 245 U. S. 319) and a denial of the petition may not preclude another application for naturalization. *In re Pollock*, 257 Fed. 350. \* \* \*

\* \* \* Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution, whether the subject of the litigation be property or status. A petition for naturalization is clearly a proceeding of that character.

The petitioner's claim is one arising under the Constitution and laws of the United States. The claim is presented to the court in such a form that the judicial power is capable of acting upon it. The proceeding is instituted and is conducted throughout according to the regular course of judicial procedure. The United States is always a possible adverse party. By section 11 of the naturalization act the full rights of a litigant are expressly reserved to it. See *In re Mudarri*, 176 Fed. 465. Its contentions are submitted to the court for adjudication. See *Smith* v. *Adams*, 130 U. S. 167, 173–174. Section 9 provides that every final hearing must be held in open court; that upon such hearing the applicant and witnesses shall be examined under oath before the court and in its presence; and that every final order must be made under the hand of the court and shall be entered in full upon the record. The judgment entered, like other judgments of a court of record, is accepted as complete evidence of its own validity unless set aside. *Campbell* v. *Gordon*, 6 Cranch 176; *Spratt* v. *Spratt*, 4 Pet. 393, 408. It may not be collaterally attacked. *Pintsch Compressing Co.* v. *Bergin*, 84 Fed. 140. If a certificate is procured when the prescribed qualifications have no existence in fact, it may be canceled by suit. "It is in this respect," as stated in *Johannessen* v. *United States*, 225 U. S. 227, (238) "closely analogous to a public grant of land (Rev. Stat., sec. 2289, etc.), or of the exclusive right to make, use, and vend a new and useful invention (Rev. Stat., sec. 4883, etc.)."

The opportunity to become a citizen of the United States is said to be merely a privilege and not a right. It is true that the Constitution does not confer upon aliens the right to naturalization. But it authorizes Congress to establish a uniform rule therefor. Art. I, sec. 8, cl. 4. The opportunity having been conferred by the naturalization act, there is a statutory right in the alien to submit his petition and evidence to a court, to have that tribunal pass upon them, and, if the requisite facts are established to receive the certificate. See *United States* v. *Shanahan*, 232 Fed. 169, 171. There is, of course, no "right to naturalization unless all statutory requirements are complied with." *United States* v. *Ginsberg*, 243 U. S. 472, 475; *Luria* v. *United States*, 231 U. S. 9, 22. The applicant for citizenship, like other suitors who institute proceedings in a court of justice to secure the determination of an asserted right, must allege in his petition the fulfillment of all conditions upon the existence of which the alleged right is made dependent; and he must establish these allegations by competent evidence to the satisfaction of the court. *In re Bodek*, 63 Fed. 813, 814, 815; *In re an Alien*, 7 Hill (N. Y.) 137. In passing upon the application the court exercises judicial judgment. It does not confer or withhold a favor.

Thus we see, in this late pronouncement, an individual may bring a proceeding in a district Federal court to acquire a certificate which

involves no property right, but merely a status, and which certificate is only prima facie evidence of his status, and which may be canceled by suit if the facts upon which the certificate was granted are afterwards judicially ascertained to be incorrect, and such a proceeding is declared to be a "case" within the meaning of Article III, section 2, because it was a matter *presented in such form that judicial action might be had upon the proof and issues presented where a status or a right was involved*.

We regard the principles announced in the recent decision of the Supreme Court of the United States in *Fidelity National Bank and Trust Co. of Kansas City et. al., supra*, as being conclusive authority for the position we have taken in this case. In a very logical opinion by Mr. Justice Stone, the reasoning and conclusions in *Tutun* v. *United States, supra*, are approved and the application of the terms "cases" and "controversies" to the issues at hand is stated in such a definite manner as to decide precisely, we think, the question before us.

The charter of Kansas City, concerning public street improvements, provided that after the city had passed its ordinance for the improvements and made an approximate estimate of the costs of the work as affecting the owners of lands chargeable, that the city should file a proceeding in the circuit court of Jackson County, Mo., against the owners of the land for the purpose of having the court determine the validity of the ordinance and the question as to whether or not the respective tracts of land should be chargeable with the lien of said work as provided by the ordinance. After judgment, if the validity of the ordinance and lien was upheld, the improvements might proceed. The object of the legal determination of such validity, as an intermediate step in the improvement proceeding, was, obviously, for the purpose, among other things, of insuring the sale of the bonds. Tax bills were issued against the several benefited tracts of land, some of which bills were held by the Fidelity National Bank and Trust Co. Swope and others, being the owners of certain lands assessed, brought suit to cancel the tax bills issued against them. The proceeding was instituted in the Federal court, on account of the diversity of citizenship.

One of the important questions before the Circuit Court of Appeals and the Supreme Court was as to whether the action in the State court was a "case" or a "controversy." It was, apparently, conceded that if it was a "case" or a "controversy" there, it was a "case" or a "controversy" when it reached the Federal court. The Supreme Court said:

But if the determination of the State court was *res adjudicata* according to its laws and procedure, no reason is suggested, nor are we able to perceive any, why it is not to be deemed res adjudicata here, if the proceeding in the State court was a "case" or "controversy" within the appellate jurisdiction of this

court (Fed. Const., Art. III, sec. 2) so that constitutional rights asserted, or which might have been asserted in that proceeding could eventually have been reviewed here.

That this proceeding authorized by section 28 of the Kansas City charter was judicial in character appears from an inspection of the statute and the record in the circuit court. The proposed improvement having been authorized, the benefit district established, the estimated cost ascertained, all by action of the city council or the board of public works essentially legislative in character, the jurisdiction of the State court was invoked in an adversary proceeding to determine the validity of the liens imposed or to be imposed under the ordinance. That court is a court of general jurisdiction, having plenary power to determine all questions arising under the State law or the laws and Constitution of the United States. Section 2436 Mo. Rev. Stat. 1919; *Schmelzer* v. *Kansas City*, 295 Mo. 322. These questions are required to be determined in a trial in accordance with the laws and constitution of the State. The sole duty and power of the court is to pass upon questions of law and to inquire judicially into the facts so far as necessary to ascertain the applicable rules of law. See *Keller* v. *Potomac Elec. Co.*, 261 U. S. 428, 440. Under this procedure, the judgment to be awarded finally determines, subject to appeal, the validity of the ordinance authorizing the improvement, the limits of the benefit district, the method of apportioning benefits, and the validity of the proposed liens. That the issues thus raised and judicially determined would constitute a case or controversy if raised and determined in a suit brought by the taxpayer to enjoin further proceedings under the ordinance could not fairly be questioned. *Compare Risty* v. *Chicago, R. I. & Pac. Ry. Co., supra*. They can not be deemed any the less so because through a modified procedure the parties are reversed and the same issues are raised and finally determined at the behest of the city. * * *

While ordinarily a case or judicial controversy results in a judgment requiring award of process of execution to carry it into effect, such relief is not an indispensable adjunct to the exercise of the judicial function. Naturalization proceedings (*Tutun* v. *United States*, 270 U. S. 568); suits to determine a matrimonial or other status; suits for instructions to a trustee or for the construction of a will (*Traphagen* v. *Levy*, 45 N. J. Eq. 448); bills of interpleader, so far as the stakeholder is concerned (*Wakeman* v. *Kingsland*, 46 N. J. Eq. 113); bills to quiet title where the plaintiff rests his claim on adverse possession (*Sharon* v. *Tucker*, 144 U. S. 533) are familiar examples of judicial proceedings which result in an adjudication of the rights of litigants, although execution is not necessary to carry the judgment into effect, in the sense that no damages are required to be paid or acts to be performed by the parties. *Cf. Kennedy* v. *Babcock*, 19 Misc. (N. Y.) 87; *Cohen* v. *N. Y. Mutual Life Ins. Co.*, 50 N. Y. 610, 625. Nor is it essential that only established and generally recognized forms of remedy should be invoked. "Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Constitution, whether the subject of the litigation be property or status." *Tutun* v. *United States, supra*, 577. Thus, naturalization proceedings (*Tutun* v. *United States, supra*), or a special statutory proceeding to determine judicially whether the claim made by a domestic corporation against a foreign country upon which an award had been made by a United States commissioner pursuant to treaty, had been furthered by fraud, the statute authorizing distribution of the fund in accordance with the judgment (*La Abra Silver Mining Co.* v. *United States*, 175 U. S. 423), are cases or controversies within the meaning of the Constitution.

210

Other cases might be quoted from at length to the same effect. Among them, prominently, are *Murray's Lessee et al.* v. *Hoboken Land and Improvement Co., supra,* and *Interstate Commerce Commission* v. *Brimson, supra.* In the first of these cases it appears that Congress had authorized a collector to bring before a district court the question of how much he was indebted to the Government. The act provided that the submission of the question to the district court suspended the distress warrant issued by the Solicitor of the Treasury Department and that, in effect, the judicial determination of the amount due fixed the sum to be collected on the warrant. The court, in holding that such a proceeding brought before the court a matter which was properly the subject of judicial cognizance, said:

To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider Congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for *judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States,* as it may deem proper. Equitable claims to land by the inhabitants of ceded territories form a striking instance of such a class of cases; and as it depends upon the will of Congress whether a remedy in the courts shall be allowed at all, in such cases, they may regulate it and prescribe such rules of determination as they may think just and needful. Thus it has been repeatedly decided in this class of cases, that upon their trial the acts of executive officers, done under the authority of Congress, were conclusive, either upon particular facts involved in the inquiry or upon the whole title. *Foley* v. *Harrison,* 15 How. 433; *Burgess* v. *Gray,* 16 How. 48; ————— v. *The Minnesota Mining Co.* at the present term. (Italics ours.)

It is true, also, that even in a suit between private persons to try a question of private right, the action of the executive power, upon a matter committed to its determination by the Constitution and laws, is conclusive. *Luther* v. *Borden,* 7 How. 1; *Doe* v. *Braden,* 16 How. 635.

To apply these principles to the case before us, we say that, though a suit may be brought against the marshal for seizing property under such a warrant of distress, and he may be put to show his justification; yet the action of the executive power in issuing the warrant, pursuant to the act of 1820, passed under the powers to collect and disburse the revenue granted by the Constitution, is conclusive evidence of the facts recited in it, and of the authority to make the levy; that though no suit can be brought against the United States without the consent of Congress, yet Congress may consent to have a suit brought, to try the question whether the collector be indebted, that being a subject capable of judicial determination, and may empower a court to act on that determination, and restrain the levy of the warrant of distress within the limits of the debt judicially found to exist.

The question before us now is presented *in such form* as to *bring it under the judicial power* and "is presented in such form that the judicial power is capable of acting" thereon and is "susceptible of judicial determination."

In Interstate Commerce Commission *v.* Brimson, supra, a circuit court of the United States was called upon to direct witnesses to appear and testify before the Interstate Commerce Commission, and it was contended that the matter was not a case or a controversy and that, therefore, the court, being an inferior court, was without jurisdiction under Article III of the Constitution. The Supreme Court held to the contrary, notwithstanding the fact that the proceeding was merely in the nature of an aid to the Interstate Commerce Commission in the discharge of an administrative duty, and notwithstanding the fact that if the Interstate Commerce Commission dismissed the proceeding, the mandate of the circuit court was without further effect. It was the determination of a status, the judicial determination of a controverted matter, which was to be a part of the proceeding, administrative in character, but was a "final and indisputable basis of action" as between the commission and the defendants.

Mr. Justice Harlan, speaking for the court, said:

* * * If it be adjudged that the defendants are, in law, obliged to do what they have refused to do, that determination will not be merely ancillary and advisory, but, in the words of Sanborn's case, will be a "final and indisputable basis of action," as between the commission and the defendants, and will furnish a precedent in all similar cases. It will be as much a judgment that may be carried into effect by judicial process as one for money, or for the recovery of property, or a judgment in mandamus commanding the performance of an act or duty which the law requires to be performed, or a judgment prohibiting the doing of something which the law will not sanction. It is none the less the judgment of a judicial tribunal dealing with questions judicial in their nature, and presented in the customary forms of judicial proceedings, because its effect may be to aid an administrative or executive body in the performance of duties legally imposed upon it by Congress in execution of a power granted by the Constitution.

If we paraphrase the above language of the Supreme Court, we can say, with equal force, that if it be adjudged that the defendants or respondents in the pending case are violators of the law under consideration, that determination "will not be merely ancillary and advisory," but will be a "final and indisputable basis of action" for future proceedings. See *Interstate Commerce Commission* v. *Baird,* 194 U. S. 25.

We can not agree with the argument made by the appellees, the Bakelite Corporation et al., that our judgment in this case must be one that will be enforceable by execution or process. If it declares or denies the existence of a right or a status (and does so conclusively and finally) which in turn affects a valuable interest or right, and otherwise meets the requirements of a "case" and "controversy," under the foregoing decisions cited, it certainly is such. *Fidelity National Bank and Trust Co. of Kansas City et al.* v. *Swope et al., supra.*

Let us suppose that this court, and the Supreme Court, reviewing our judgment, should hold that the violation of a patent right is, in law, not an unfair method of competition or an unfair act in importation. Could the President lawfully hold that it was? We think not. The statute would seem to leave the definition of these terms to the courts as it did in the Federal Trade Commission act. *Federal Trade Commission* v. *Gratz et al.,* 253 U. S. 421; *Federal Trade Commission* v. *Curtis Publishing Co.,* 260 U. S. 568. As an illustration of this conclusion, let us again suppose that after this court or the Supreme Court had held that the violation of a patent right was not such an "unfair method," etc., the President would decide that it was, and such decision would cause the collector to reject the entry of respondent's merchandise, and he would litigate the matter on the theory that the question had been adjudicated. What could any court do but hold that as between the parties the matter had been finally and conclusively determined in the court and that its decision was *res adjudicata?*

Section 316 of the Tariff Act of 1922, which is now in part before us for construction, in many respects is an absolute and precise copy of the Federal Trade Commission act (U. S. Stat. L., vol. 38, pt. 1, ch. 311, p. 717), and the antitrust act (Clayton Act) (U. S. Stat. L., vol. 38, p. 730).

The Federal Trade Commission is admittedly an administrative body and its acts have been declared to be administrative in character and not judicial. *Federal Trade Commission* v. *Eastman Kodak Co. et al.,* 274 U. S. 619. The Federal Trade Commission act, however, provides that unfair methods of competition in commerce are unlawful. The act at bar provides that "unfair methods of competition and unfair acts in importation" are unlawful. Both acts provide that the respective bodies, the Federal Trade Commission and the United States Tariff Commission, may institute proceedings for determining the question of fact as to whether or not the party complained of is in violation of the law in the respect indicated. The Federal Trade Commission, after finding its facts, is authorized to issue an order requiring such person to desist from the unlawful practice. If the person so ordered fails to comply, the commission may apply to the Circuit Court of Appeals for the enforcement of its order, or the party so ordered may obtain a *review* or file a petition to set aside the order, which proceeding is nothing more than an appeal, regardless of what it may be styled in the act. *United States* v. *Ritchie, supra; Stephens* v. *Cherokee Nation,* 174 U. S. 445, 477. The commission files its record in that court, which issues notice upon the same, and determines the questions therein, and *may affirm, modify, or set aside* the orders of the commission.

In the Federal Trade Commission act, as in the act before us, it is provided that the findings of the commission as to the facts, if supported by the testimony, shall be conclusive. In both acts the same provision is made for taking new testimony. When the matter is before the Federal Trade Commission its finding is not a judgment, and it has no process to enforce its decree, but when the matter gets into the Circuit Court of Appeals or the Supreme Court of the United States it is there "presented in such form" that judicial cognizance may be taken thereof and a final, binding judgment as to the question passed upon may be had.

What has been said here as to the review by a circuit court of appeals of an order of the Federal Trade Commission is also true as to the enforcement provision of the Clayton Antitrust Act. The Clayton Antitrust Act and the United States Tariff Commission provision under consideration seem to be almost in the exact phraseology of the Federal Trade Commission act.

In *Interstate Commerce Commission* v. *Brimson, supra,* the Supreme Court held that the proceeding before a circuit court of appeals to compel witnesses to answer questions before the Interstate Commerce Commission was not repugnant to the Constitution as not being a "case" or "controversy." As far as we have been able to ascertain, the power of such court to review and "reverse, modify and set aside" the orders of the Interstate Commerce Commission and the Federal Trade Commission has never been further questioned. Certainly these proceedings are in the nature of an *aid or a help to an administrative body in the performance of a purely administrative duty.* They are not "cases" before the commissions and they are not independent actions before the court. They are, however, held to be "cases" although the identical issues arose and were passed upon by an administrative body.

True enough, the judgment of the Circuit Court of Appeals in some of the matters it reviews from the two commissions mentioned may have the matter presented to them in such form that process may reach out and execute the judgment, but in others, as we have seen, this does not maintain, and, in our view of the matter, it is not essential that the action should be such an one as to require or necessitate process. *Tutun* v. *United States, supra; Murray's Lessee et al.* v. *Hoboken Land and Improvement Co., supra; Fidelity National Bank and Trust Co. of Kansas City et al.* v. *Swope et al., supra.*

On October 7, 1922, President Harding issued his Executive order, which is still in full force and effect, and is as follows:

It is ordered that all requests, applications, or petitions for action or relief under the provisions of sections 315, 316, and 317 of Title III of the Tariff Act approved September 21, 1922, shall be filed with or referred to the United States Tariff Commission for consideration and for such investigation as shall

be in accordance with law and the public interest, under rules and regulations to be prescribed by such commission. See Opinions of Attorneys General, vol. 34, p. 79.

Without suggesting what weight the indicated executive interpretation of the act involved in the order is to be given in the consideration of the question at hand, we regard it as of some importance as illustrating the operation of the act when given a certain construction.

The foregoing considerations lead us to the conclusion that the matters presented in the instant appeal are presented in such form as to call for the exercise of the judicial powers of this inferior court, and that our exercise of the same is not in contravention of the provisions of the Constitution.

The motion of the Bakelite Corporation et al. is, therefore, *overruled*.

### CONCURRING OPINION

BARBER, Judge: I concur in the conclusions reached by the court, but it would, in my opinion, be more in conformity with the established practice of this court to enter judgment denying the motion to dismiss without now handing down an opinion.

The only controverted issue is whether or not a case or controversy, within the meaning of section 2 of Article III of the Constitution, is presented; of which this court, as an inferior court, ordained and established by Congress under section 1 of said article, has jurisdiction. An opinion on that question can better be written after the case has been heard on the merits. So far as I recall, our practice has been, when a motion to dismiss for want of jurisdiction *is denied*, to discuss all relevant questions in the opinion handed down when the case is heard and decided upon the merits.

See *Atlantic Transport Co.* v. *United States*, 5 Ct. Cust. Appls. 373, T. D. 34872; *Fish* v. *United States*, 12 Ct. Cust. Appls. 308, T. D. 40315.